**STATE of Tennessee, Appellee,**

v.

**Billy Murrell MEEKS, Danny Ray Meeks, and Debra Meeks, Appellants.**

Court of Criminal Appeals of Tennessee, at Nashville.

Aug. 5, 1993.

Permission to Appeal Denied Nov. 1, 1993.

Howell C. Clements, Chattanooga, for appellant Billy Meeks.

John M. McCord, Tullahoma, for appellants Danny and Debra Meeks.

Charles W. Burson, Atty. Gen., and Jeannie Kaess, Asst. Atty. Gen., Nashville, James Michael Taylor, Dist. Atty. Gen., Dayton, Thomas D. Hembree, Asst. Dist. Atty. Gen., Jasper, for appellee.

## OPINION

TIPTON, Judge.

The defendants, Billy Murrell Meeks, Danny Ray Meeks and Debra Meeks, appeal as of right from convictions they received in a jury trial in the Grundy County Circuit

Court. Billy Meeks was convicted of aggravated kidnapping, especially aggravated robbery, aggravated burglary and extortion for which he received an effective sentence of thirty-nine years in the Department of Correction. Danny Meeks was convicted of the same offenses and received an effective sentence of forty-eight years in the Department of Correction. Debra Meeks was convicted of conspiracy to commit both aggravated kidnapping and especially aggravated robbery and of extortion for which she received concurrent sentences totalling eight years. Billy and Danny Meeks are brothers and Danny and Debra Meeks are husband and wife.

The defendants raise the following issues for consideration:

(1) Whether the evidence was legally sufficient to justify the defendants' convictions.

(2) Whether Billy Meeks was entitled to a severance because of the prejudicial effect of evidence of Danny Meeks' criminal history.

(3) Whether items seized from Danny and Debra Meeks' residence should have been suppressed as evidence because they resulted from the execution of a search warrant which failed to describe the items to be seized and which was based upon a knowingly false affidavit.

(4) Whether evidence of the victim's out-of-court statement that Billy Meeks was a perpetrator should have been excluded.

(5) Whether records of a telephone company computer program used to trace telephone calls should have been excluded.

(6) Whether it was error for the prosecutor to argue that the state could not obtain the defendants' voice exemplars and for the trial court to refuse to instruct the jury that the state could require such exemplars.

(7) Whether separate convictions for aggravated kidnapping and especially aggravated robbery are warranted from the evidence relative to double jeopardy and due process concerns.

(8) Whether Billy and Danny Meeks should have received consecutive sentences.

The case relates to the abduction and robbery of Roger Phipps and the subsequent extortion of him and his wife, Lisa. The central factual issue from the defendants' perspective was the identity of the perpetrators.

Roger Phipps, the victim, testified that on Sunday, November 26, 1989, he had left his parents' house around 6:15 P.M. and was driving to his home, a trailer, where he lived with his wife and four-month-old child. It was dark outside and was very foggy with drizzling rain. About half way down his driveway, a tree blocked his path and he got out to move it. When he was in front of his truck, two men ran toward him, each carrying a black, long-barrel revolver. The two men wore ski masks covering their faces except for their eyes. They had hoods over their heads and masks and wore heavy coats. The victim identified a hood obtained from Debra and Danny Meeks' house as identical to that of one of the assailants.

The men yelled at him to get down on his knees and both men struck him on the head several times with their guns, with one gun discharging at the time of a blow. He was almost knocked out by the beating. The victim testified that the taller, slimmer man said, "You're going to die" and "Get on your knees, or you're going to die, we're going to kill you." The shorter, stocky man led the victim to the truck while the slimmer man moved the tree. The stocky one drove toward the victim's house while the slimmer one held a gun to the victim's head. At the house, the driver got out and the victim heard glass breaking, a gunshot, and then more glass breaking.

As to what happened at the trailer, Lisa Phipps testified that a man wearing an off-white color ski mask covered by a camouflage-colored hood came to the door and tried to get in. When she would not let him in, he shot through the door. He yelled for her to open the door and broke the glass in her living room windows. She stated that he extended his upper body into her living room and pointed a gun at her. She ran to the bedroom to hide her child and she heard more glass breaking. She called her father-

in-law, Jack Phipps, and her burglar alarm went off. The man left.

The victim testified that they drove to a place on the mountain where the men tied his hands and wrists behind his back with plastic wire-tie straps and his feet with a white, nylon rope. He identified the straps which were used and identified a strap obtained from Debra and Danny Meeks' property as similar to them. Also, he identified nylon rope obtained from a bedroom in Debra and Danny Meeks' house as similar to the one used to tie his feet.

The slimmer man took his wallet, credit cards, some checks, $27.00 in cash, and a bank card. At their request, the victim divulged his bank card and unlisted telephone numbers. The slimmer man, still pointing a pistol, asked the victim if his family had money and if his family would contact the police, mentioning the sum of $200,000. The victim's shirt was ripped open and used to gag him, while a camouflage net covered his head.

One of the men took a knife and stroked it up and down the victim's stomach and back and forth across his chest. The man pulled the victim's head back and drew the knife across his throat. At some point, the stocky man drove off in the truck toward Pelham, after which each time a car passed nearby, the remaining assailant pointed a gun at the defendant and threatened him with death if he made any noise.

As to what was occurring while the victim was held captive, Bobby Jack Northcutt testified that he saw Danny Meeks around 7:00 P.M. using the pay phone at Wonder Cave Market in Pelham. He said one of the cars in the parking lot was a blue Plymouth Charger. Lisa Phipps testified that a woman called her around 7:30 P.M. and warned her, "Get the law out of it, you'll be contacted." She said that after receiving this telephone call, Officer Stacy Williams installed a recording device on her telephone. Shirley Phipps, the victim's mother, testified that a woman called her house and told her, "Shirley, get the law out of this now or Roger dies." Officer Williams testified that he found the victim's truck about a mile from the Pelham community, which was ultimately determined to be about seven miles from where the victim was being held captive. Officer Larry Davis stated that the Wonder Cave Market was about a ten-minute drive from the place where the victim was held captive.

The victim testified that during his captivity, he engaged the remaining, slimmer assailant in conversation. Ultimately, a car appeared and the assailant left. Before he left, though, he told the victim, "You always remember Mr. Beauregard."

The victim worked himself free of the restraints and began walking. Around 11:00 P.M., he stopped Officer Billy Scissom's police car and was taken to some other officers and then home. Ultimately, he went to the jail and talked to various people there including the sheriff. He went back to the scene with the officers where his knife and the strap used to bind his wrists were found. He was taken back to the jail where he talked with various officers and his mother. Ultimately, his father took him to the hospital to treat cuts in the back of his head.

Rebecca Byers, a dispatcher for the Grundy County Sheriff's Department, testified that at 11:27 P.M. she received a call from a woman who said, "If you want Roger Phipps, go to Close Hill Mountain. He is at the second slide twenty feet below." The evidence showed this call was traced to a pay phone at Scott's Service Station in Monteagle.

Officer Mike Fults testified that around 11:30 that night, he was at the victim's home and answered the telephone. A female caller asked to speak to Lisa, but refused to talk to anyone else and hung up. A tape-recording was made of this short conversation. Officer Fults did not know who the caller was, but he testified that he later identified the caller as Debra Meeks when he heard Debra Meeks' voice the next week while participating in the execution of a search warrant. Lisa Phipps testified that she listened to the tape-recording of the conversation and recognized the caller's voice as belonging to Debra Meeks.

Karen Meeks, a friend of Lisa Phipps, testified that she came to see Lisa Phipps

shortly after the break-in and was with her when Lisa received the 7:30 P.M. telephone call. Ms. Meeks stated that she listened to the conversation on an extension phone and that she has listened to the tape-recording of the later telephone conversation. She said that, although she does not know Debra Meeks' voice, she determined that it was the same voice in both the first telephone call and the tape-recorded call.

On November 28, 1989, two days after his kidnapping, the victim received a telephone call at his father's house. Lisa Phipps testified that she answered the telephone and the same female voice from the earlier calls asked, "Will Roger accept a call from Mr. Beauregard?" The victim took the receiver and held it in a way to allow TBI Agent Larry Davis to overhear the conversation. The caller said, "I have some information for you from Mr. Beauregard. Do you remember Mr. Beauregard?" The caller told the victim to be home at 9:00 A.M. the following morning.

The victim testified that a call tracer was placed on his telephone line and that Agent Davis installed a recording device on his telephone. At 9:13 A.M. the next day, the victim received a call from a man whose voice sounded disguised. The call was recorded and was traced to a pay phone at Scott's Service Station in Monteagle. The caller said that the victim was insisting on involving the police and was endangering the victim's family. He told the victim to go to Geary's Raceway Market in order to receive a call. As to the 9:13 A.M. telephone call, Agent Davis' testimony and the transcript of the recorded call indicate that the caller hung up the phone before the victim had finished talking.

The victim and Agent Davis went to the market and received a call about twenty minutes later. The victim testified that the caller was angry and told him that he had "messed up" by talking to the police and would realize his mistake when somebody died because of it.

The proof showed that various members of the Phipps family were assigned to watch various pay phones in the area in anticipation of the 9:00 A.M. call to the victim's home.

Doyle Phipps, the victim's uncle, testified that he was watching Scott's Service Station and saw Billy and Danny Meeks arrive in a blue, four-door Mercury, bearing a license plate later proven to be registered to Debra Meeks. He stated he saw both men at the pay phone at 9:13 A.M. and saw Billy Meeks wrap a blue cloth around the phone, dial a number, and begin talking. Doyle Phipps stated that he then drove to the gas station and when Danny Meeks saw him, Danny grabbed the phone out of Billy's hand and hung it up. He said they got into their car and drove away.

The victim identified Danny Meeks as his stocky assailant and Billy Meeks as the slimmer one. He testified that he had known the two of them most of his life and that they had worked in his family's business. He said he recognized the voice on the two calls as that of Billy Meeks even though it sounded altered and stated that it was the same voice of his slimmer assailant. Lisa Phipps testified that she was acquainted with Debra and Danny Meeks because they have had children in her school classes for the last four years. She said that she had met Debra on several occasions and that Danny had accompanied her class on a day-long field trip. She said that she had heard him talking on and off all that day. She identified Danny Meeks as the man who tried to break into the trailer.

Through cross-examination of the various state's witnesses, the defense sought to prove the witnesses' inability to identify or mistaken identity of the defendants. It was shown that the victim had not told officers on the night of his kidnapping that he identified his assailants. Also, no mention of the assailants' identity was in the fifteen-page statement which Agent Davis obtained from the victim. The victim acknowledged that he had not had an occasion to visit with Billy Meeks in the last seven years, other than to say hello and chat briefly. Further, no mention of the identity of the defendants was in the statement Agent Davis obtained from Lisa Phipps.

However, the victim and his mother testified that on the night of the offense, his

mother met him at the jail and he told her that the man who held him captive was Billy Meeks. Also, Agent Davis explained that the statement he obtained on November 28 resulted from an incomplete, interrupted interview and that the victim had identified Billy Meeks after the interruption, but Agent Davis had failed to include it in the statement.

All three defendants testified and numerous other witnesses were called by the defense to support their claim that they were not the perpetrators. The defendants denied committing any offenses against the Phipps. Danny Meeks denied making any telephone call to the Phipps residence on November 29, 1989, and Debra Meeks denied making calls to the victim's residence on November 26, 1989. Also, she stated that she listened to the voice of the tape-recorded telephone conversations and the voice was not hers.

The defense proof reflected that, while the victim was being robbed and kidnapped, Debra and Danny Meeks were making two trips to Pelham and back. They drove her 1986 blue Mercury, Grand Marquis. They left their house around 4:30 P.M. to drive to the house of Danny Meeks' brother, Don Meeks. They arrived about 5:30 P.M. at the same time Billy Smith and Patricia Winton were leaving. Mr. Smith and Ms. Winton verified that the Meeks arrived at 5:30 P.M.

Danny Meeks testified that around 7:00 P.M., he and Don left in Don's truck to go to the Wonder Cave Market to telephone his boys about charging a battery. He said that Bobby Jack Northcutt was using the phone and they had to wait for him to finish his call. Afterwards, they came back to the house and then Danny and Debra left around 7:15 P.M. to go home to pick up the battery for Don's truck.

On the way back, the two stopped at Geary's Raceway Market and while Danny was pumping gas, Debra telephoned home to tell her boys to get ready if they wanted to ride back to Don's house with them. She said that she visited with Keith Stiefel and Melvin Parsons for a couple of minutes. Melvin Parsons testified that he had seen Debra using the phone at 8:15 P.M. Debra and Danny testified that they arrived home at about 8:30 P.M., put the battery in the car, and then drove with their sons back to Don Meeks' house. They arrived at about 9:30 at night and left around 10:00 P.M., arriving home a little before 11:00 P.M.

June Smith Buckner, Don Meeks' girlfriend, testified that she was with Don on the night of November 26, 1989, and she confirmed Danny and Debra Meeks' story. She denied that the reason Don left the house at 7:00 P.M. was to pick up Danny Meeks after he abandoned the victim's truck on the side of the road.

Jeremy Meeks, the sixteen-year-old, son of Debra and Danny Meeks, testified that his father called him around 7:00 P.M. and told him to place a battery charger on a battery. He stated that Don Meeks did not have a telephone and that he did not know where his father was using a phone. Jeremy and his brother, Jessie, testified that they took the battery to Don Meeks' house and stayed for awhile.

Danny and Debra testified that on the morning of November 27, they went to Chattanooga to sell a load of metal to the Southern Foundry. Invoices and check stubs were introduced proving the transaction. On November 28, Danny Meeks stayed home all day, except for a short errand to an auto parts store. On the morning of November 29, at 7:00 A.M., Danny took Debra to his mother's house in order that she could help her with some chores. Danny testified that he went by Billy Meeks' house and picked him up and drove toward Pelham. He stated that he noticed the fuel was low and that he turned around and went back to Scott's Service Station in Monteagle. He said he was about to put some gasoline in the car when he realized that he did not have his wallet. He said Billy was using the phone and when he was through, Danny telephoned Debra to tell her that he could not find his wallet. Danny's mother, Edna Meeks, confirmed that Debra received a phone call around 9:00 A.M. Billy Meeks' mother-in-law, Elsie Sanders, confirmed that Billy called her at 9:25 A.M. Danny Meeks testified that he and Billy saw Doyle Phipps drive into the station and that they waved.

Debra and Danny Meeks both testified regarding taking a school field trip in May, 1989. They did not ride on the school bus and neither of them remembered seeing or speaking to Lisa Phipps all day. Debra stated that she last talked to Lisa Phipps in May, 1989, when they ran into each other at school. She denied making a telephone call to the jail on the night of November 26, 1989.

The record reflects that Danny Meeks acknowledged having eight separate felony convictions, including concealing stolen property, extortion and attempting to bribe a witness. Debra Meeks acknowledged that she talked to Agent Davis and another officer on the day that her husband was arrested, but she did not tell them that her husband could not have committed the offenses because he was with her on the night they occurred. She said that she had not relayed this information to anyone other than her attorneys until she testified.

Billy Meeks testified that he had seen the victim once the summer before and had spoken to him a time or two in the last ten years. He explained that in telephoning from a public pay phone he uses a rag to wipe the phone because of germs. Billy Meeks admitted that he had previously been convicted of grand larceny and concealing stolen property. He denied any participation in the offenses. His proof reflected that on November 26, 1989, he had been working on the house of Norman Phipps, drank a lot of beer and went home. Billy's wife, Tammie, and their daughter, Misty, corroborated his testimony about his whereabouts on November 26. Also, Tammie denied that her husband had any weapon or any camouflage clothes.

Kathleen Phipps, Norman Phipps' wife, indicated that Billy left her home around 5:00 P.M. with Tammie driving and that he was drunk. Norman Phipps, a cousin of the victim, corroborated his wife's testimony about Billy's working on his house and his intoxicated condition. Also, he stated that he was aware that Billy used a rag to wipe off pay phone receivers because he is germ conscious. John K. Seagroves testified that he saw Billy at Billy's home that evening some time between 7:30 and 10:00 P.M. He said

that Billy was sleeping on the couch and that he could not wake Billy up. He stated that Tammie was there and that Billy smelled of beer.

Elsie Sanders testified that Billy Meeks called her around 9:30 A.M., November 29, about his doing work on her house the following weekend. Evidence was introduced showing that her phone number is only one number different than the victim's phone number.

Dr. Walter Manning testified as an expert in speech acoustics relative to speech characteristics. He said he had studied voice comparison analysis for five or six years. He stated that he had compared a tape-recording of Billy Meeks' voice and a copy of the tape-recording of the anonymous phone call received at the Phipps residence around 9:00 A.M., November 29, 1989. He stated that he was eighty percent sure that the voice of the anonymous caller was not Billy Meeks' voice.

## I

■ The defendants contend that the evidence was insufficient to identify them beyond a reasonable doubt as the perpetrators of the crimes. When the sufficiency of the evidence is questioned on appeal, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2789 (1979). This means that the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

■ The record reflects that the trial was hard fought, being well prosecuted and well defended. However, the jury resolved the issues in favor of the state and the trial court approved the verdicts. Under these circumstances, although many factual issues were strongly contested, we are not in a position to reweigh the evidence or draw our own conclusions about which witnesses to accredit. In viewing the evidence in the light most favorable to the state, as is our obligation, it

is obvious that there was ample evidence from which the jury could conclude beyond a reasonable doubt that the offenses on trial occurred and that they were committed by the defendants.

## II

Billy Meeks contends that he was entitled to a severance because he was unfairly prejudiced in his defense by the state's proving that Danny Meeks had eight previous felony convictions, particularly one involving extortion because extortion was a charged offense. Relative to this issue, Rule 14(c)(2), Tenn. R.Crim.P., provides that a defendant is entitled to a severance if it is appropriate or necessary to promote or achieve a fair determination of that defendant's guilt or lack thereof. *See State v. Wiseman,* 643 S.W.2d 354 (Tenn.Crim.App.1982). However, whether or not to grant a severance is a matter which rests within the sound discretion of the trial court. *State v. Coleman,* 619 S.W.2d 112, 116 (Tenn.1981).

■ The offenses on trial were so closely connected, involving conspiracy and joint endeavor, that it was appropriate to try the defendants together. Tenn.R.Crim.P. 8(c). Joint trial contemplates that evidence may be admitted against one or more defendants which is not necessarily applicable to another defendant. *See Black v. State,* 794 S.W.2d 752, 758 (Tenn.Crim.App.1990). This means that the mere fact that damaging proof against one defendant is presented will not, by itself, entitle another defendant to a severance. What must be shown is that a defendant was clearly prejudiced by the evidence regarding the codefendant to the point that it became a judicial duty to grant a severance. *See State v. Burton,* 751 S.W.2d 440, 447 (Tenn.Crim.App.1988). In this regard, we hold that the record fails to reflect that the speculative risk of a spill-over effect upon Billy Meeks from his brother's history of convictions justifies a conclusion that a joint trial was an abuse of discretion.

## III

Debra and Danny Meeks contend that the camouflage cap, gloves, ski masks, nylon rope and plastic strap coming from their residence should not have been used in evidence because they were obtained by an unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. Their argument is two-fold: (1) that Deputy Brian Wiley knowingly made a false statement in his affidavit in support of the search warrant's issuance and (2) that the search warrant did not particularly describe the property to be seized and was an improper general warrant.

### (A)

■ On December 2, 1989, Deputy Wiley made an affidavit upon which a search warrant issued for the search of Debra and Danny Meeks' home. The gist of the affidavit was that a previous robbery of a Mr. and Mrs. Gilliam on October 29, 1989, was connected to Debra and Danny Meeks as was the robbery in this case through Debra's car. In pertinent part, the affidavit states:

> Approximately thirty (30) minutes after the robbery, the Gilliam's automobile was located off Clouse Hill Road in Grundy County undamaged, however the above said cassette tapes and cassette head cleaner were missing. Just after the Gilliam robbery, Officer Tony Sons of the Tracy City Police Department saw a 1986 blue Ford automobile sitting in front of the Hillbilly Restaurant and Lounge after they were closed. Also Tony Gilliam, victim's brother, identified a 1986 blue Ford bearing Grundy County tag # QJN 321 on the Clouse Hill Road shortly after victim's vehicle had been found.

> On November 26, 1989, Roger Phipps was robbed and kidnapped by at least two (2) armed masked men at his home on Clouse Hill Road, Grundy County, Tennessee. By State warrants issued November 29, 1989, Danny Ray Meeks has been charged with and arrested for the Phipps robbery and kidnapping. Later that evening a 1986 blue Ford automobile bearing Grundy County Tag # QJN 321 was seized by the Grundy County Sheriff's Department and held as evidence in the Phipps robbery. This tag is registered to Debra Meeks, wife of Danny Ray Meeks.

On November 30, 1989 and December 1, 1989, I personally inspected and inventoried the Debra Meeks automobile and found therein the cassette tapes and cassette head cleaner taken in the Gilliam robbery. The tapes and cleaner have been exactly described and identified by Shirley Gilliam.

The point of contention is the defense claim that Deputy Wiley knowingly swore falsely about Officer Sons seeing a "1986 blue Ford automobile" just after the Gilliam robbery. In *State v. Little,* 560 S.W.2d 403 (Tenn.1978), our Supreme Court held that a warrant may be deemed invalid if the supporting affidavit is proven to contain "(1) a false statement made with the intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made." *Id.* at 407. No contention is made that the claimed false statement is essential to probable cause.

At the suppression hearing, Deputy Wiley testified that he received the information from Officer Sons on the night of the Gilliam robbery on October 29, 1989. The Meeks' car was seized on November 29, 1989, and Wiley recalled taking several people to view it. He stated that he called Officer Sons and went with him to look at the car. He said that he asked Sons if the car was the vehicle Sons saw on October 29 and that Sons replied that he could not say either way. He said that Sons told him that the car had square tail lights, looked to be blue under the street light, and was a Ford. Wiley testified that he could not say for sure if he showed the car to Sons before or after the search warrant was obtained, but he believed that it was after.

Officer Sons testified that he was employed by the Tracy City Police Department from August to December 8 or 10, 1989. He was no longer with a police force. He said that on October 29, 1989, he drove by the Hillbilly Restaurant and Lounge around 2:30 in the morning and saw two parked vehicles. He said they were a pale blue Lincoln, 1976 to 1977 model, which he later learned belonged to the Gilliams, and an older model

Ford, like an LTD, which was light blue or silver. He said the Ford was between a 1973 and 1976 model. He said he responded to the Gilliam robbery call and returned to the Hillbilly Restaurant about eight minutes after he first saw the two cars, but this time only the Lincoln remained. He said that he gave Deputy Wiley that night the description of the car. He said things were very hectic and acknowledged that a lot of things could be misunderstood. However, he did not believe that he told Wiley that the Ford was a 1986 model. Sons also acknowledged that the Gilliam's 1986 Oldsmobile had been taken in the robbery.

Sons testified that Wiley called him and went with him to look at the Meeks' car on a Thursday. Although he was not completely sure of the date he believed it to be November 30, 1989. He stated that he told Wiley that, in his opinion, the Meeks' car was not the same car he had seen on October 29, because the one he had seen looked to be an older model and maybe light blue or silver in in color.

The trial court found that Deputy Wiley did not include the specific description of the automobile in the affidavit with the intent to deceive the issuing magistrate. It noted that neither witness produced any notes and that the fact that Wiley took Sons to look at the Meeks' car would logically indicate Wiley's belief that the car matched Sons' description of the car seen on the night of the Gilliam robbery. Also, it indicated a lack of confidence in Sons' assertion that his viewing the Meeks' car and telling Wiley it did not match the description occurred on November 30, 1989, noting Sons' lack of certainty regarding other dates about which Sons was questioned.

▪ Debra and Danny Meeks contend that the evidence preponderates against the trial court's findings. As the defendants' argument implies, factual findings by the trial court come to us presumptively correct and we may not ignore them unless the evidence in the record preponderates against them. *See, e.g., State v. O'Guinn,* 709 S.W.2d 561, 565 (Tenn.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986); *State v. Kelly,* 603 S.W.2d 726, 729

(Tenn.1980). When the trial court determines that a witness' testimony is to be given less than full credit and the record contains support for the trial court's reasons for such a determination, it is practically impossible for an appellate court to overturn the finding absent other credible evidence in the record corroborating the questioned testimony.

In this case, there is no such corroborating evidence and the record includes support for the trial court's inherent finding that Sons' viewing of the Meeks' car was not proven to have occurred before the warrant was obtained. Under these circumstances, the record also supports the determination that Wiley did not knowingly use false information in the affidavit for the intent to deceive the issuing magistrate.

**(B)**

The search warrant for Debra and Danny Meeks' residence was issued and executed on December 2, 1989. It stated that proof had been shown "that evidence of the crime or crimes of armed robbery" was located at the residence and directed the search for and seizure of "evidence of said armed robbery or robberies." The warrant specifically incorporated Deputy Wiley's affidavit which was attached to the warrant. As previously noted, the affidavit related to the Phipps robbery and kidnapping, but it did not specify any items or property relating to the robbery. As to the Gilliam robbery, the affidavit stated that items taken from the Gilliams were "cash money, pocket books, fire arms, jewelry, check books, clothing items and their 1986 Oldsmobile automobile in which certain cassette tapes and cassette head cleaner was located."

■ Debra and Danny Meeks contend that the warrant's direction to the officer to seize "evidence of the crime or crimes of armed robbery" was too general to withstand constitutional and statutory scrutiny. The Fourth Amendment requires a search warrant to contain a particular description of the things to be seized. *See Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). Article I, Section 7 of our state Constitution prohibits general warrants and T.C.A. § 40–6–103 specifically requires search warrants to describe the property to be seized with particularity. *See Lea v. State,* 181 Tenn. 378, 181 S.W.2d 351 (1944); *Hampton v. State,* 148 Tenn. 155, 252 S.W. 1007 (1923).

■ In determining the sufficiency of the description of the items to be seized, we initially note that the description given in the warrant is not the only one to be considered. By the express reference to and incorporation of the affidavit, the warrant may be validated by the description of the items to be seized contained in the affidavit. *See, e.g., Hackerman v. State,* 189 Tenn. 130, 223 S.W.2d 194, 196 (1949); *Minton v. State,* 186 Tenn. 541, 212 S.W.2d 373 (1948); *cf. Webb v. State,* 173 Tenn. 518, 121 S.W.2d 550 (1938). Thus, the issue before us is whether or not the reference to "cash money, pocket books, fire arms, jewelry, check books, clothing items" taken in the Gilliam robbery provided a sufficiently particular description of the property to be seized.

■ The prohibition against a general warrant was intended to limit governmental intrusion upon a citizen's privacy and property rights to that shown to the magistrate to be necessary to pursue a legitimate government interest. The particular description requirement is meant to leave little discretion to the officer conducting the search in order to prevent general searches and to prevent the seizure of items upon the mistaken assumption that they fall within the warrant's authorization. *See* 2 Wayne R. LaFave, *Search and Seizure,* § 4.6(a) (2d ed. 1987). "A general order to explore and rummage through a person's belongings is not permitted. The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States v. Cook,* 657 F.2d 730, 733 (5th Cir.1981). Obviously, a warrant authorizing a search for and seizure of "evidence of the crime or crimes of armed robbery" would be invalid.

In considering what constitutes sufficient specificity in the description, a distinction has been made between the character of the targeted item, such as, illegal drugs or other contraband, and the identity of the targeted

item, i.e., the uniqueness of it to distinguish it from lawfully held property. In *Lea v. State*, 181 Tenn. 378, 181 S.W.2d 351 (1944), our Supreme Court quoted from ALR as follows:

> "Thus, where the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible."

181 S.W.2d at 352–353. *Lea* has been used by this Court to uphold a search warrant for stolen or otherwise unlawfully possessed controlled substances. *Jones v. State*, 523 S.W.2d 942 (Tenn.Crim.App.1975).

▇▇ The difficulty in this case, though, stems from the fact that the character of most of the described items does not distinguish them from other such items which may be lawfully and commonly possessed by persons in their home.

> On this basis, descriptions merely referring to "stolen car parts," "stereo tapes or players," "an undetermined amount of United States Currency," or to suits of clothing and shoes have been held insufficient. An important factor in these decisions is that it should have been possible to come up with a more specific description of the articles in question, and thus an equally general description, e.g., "42 sheets of plywood," has been upheld on the ground that the nature of such property is such as to foreclose greater specificity. By like reasoning, where the probable cause showing is that the place to be searched is a virtual warehouse of items stolen from many places, a description in terms of the general types of articles sought will suffice.

A fairly general description which includes a reference to the circumstances under which the goods were stolen, when that added fact discloses something about the condition or appearance of the goods, will suffice.

LaFave, *supra*, § 4.6(c) at 244 (citations omitted). In this case, it would be reasonable to expect that more particular descriptions of the stolen pocketbooks, firearms, jewelry and clothing were or could have been obtained from the Gilliams and should have been included in the warrant. Without the warrant describing how the Gilliams' property could be distinguished from the Meeks' similar property lawfully possessed, the executing officers were left free to seize innumerable items regardless of their actual relationship to the Gilliam robbery.[1] As previously indicated, the mere reference to evidence of the Phipps' robbery gave no guidance whatsoever.

However, we conclude that the description of "check books" taken from the Gilliams in the robbery at their home constitutes a sufficient description. In this day and age, the personalized check is part of most people's lives relative to checking accounts. The reference to the checkbooks would focus the officer executing the warrant upon a search for checkbooks designated for the Gilliams' account or accounts and including their names. No further specificity would be needed.

▇▇ A search warrant which sufficiently describes certain items but fails to provide a sufficient description for other items has been held to be partially valid if the inadequate portion can reasonably be severed. *See* LaFave, *supra*, § 4.6(f) at 257–260; *Aday v. Superior Court*, 55 Cal.2d 789, 13 Cal.Rptr. 415, 362 P.2d 47 (1961). Although not discussing the issue, this Court in *Jones v. State* upheld a search under a warrant which was specific as to unlawfully possessed

---

1. The search included the house, a shed and a fence on the premises. The return inventory of seized property, five and a half pages long, lists numerous items not used in this case including coins which apparently comprised several coin collections, coin collector books, swords, saws and a chain saw, wood sander, water hoses, various rings, earrings, necklaces, gold chains, jewelry pins, bracelets, charms, Cross pen, key chains and keys, watches, jewelry boxes, a set of scales, a set of miniature John Deere tractors, various types of rifle and shotgun ammunition, truck floormats, pieces of carpet, a microcassette tape, a plumbing fitting and "2 plastic items."

controlled substances but was general as to "other items stolen" by the defendant. 523 S.W.2d at 945. Once it is established that a search warrant is partially valid, the reasonableness of the search and seizure which takes place should be measured by the scope provided in the warrant's valid portion. For instance, if the sufficiently described items have already been found before the questioned item was found or the described items could not rationally be hidden or placed where the questioned item was found, then such item's seizure would be deemed outside the scope of a legitimate search under the warrant. *See, e.g., Carney v. State,* 525 So.2d 776 (Miss.1988); *United States v. LeBron,* 729 F.2d 533 (8th Cir.1984). On the other hand, items found during the legitimate execution of the valid part of a warrant may be admissible even though they are not specifically described in the warrant. *See United States v. Freeman,* 685 F.2d 942 (5th Cir.1982); *Palmer v. State,* 426 So.2d 950 (Ala.Crim.App.1983); *but see United States v. Apker,* 705 F.2d 293 (8th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984) (declining to extend the warrant severance doctrine to allow seizure of unspecified items in plain view).

■ In this case, we determine that the search warrant was partially valid and allowed for the executing officers to search the Meeks' premises, at least for the Gilliams' checkbooks. Items which were found during the legitimate execution of such a search would be subject to seizure if the seizure were reasonable. The reasoning is that if a warrant is partially valid and the invalid portion may be severed, the executing officers still have lawful access to the property to be searched. Also, they have lawful access to all locations on that property which can reasonably contain the items specified in the valid portion of the warrant. Finally, if during this lawful search they find items which are not specified in the warrant, but which are immediately apparent to be contraband, fruit of crime, instrumentalities of crime, or evidence of criminal conduct, their right to seize these items is governed by the plain view exception to the warrant requirement. *See e.g., State v. Jones, supra; Butler v.*

*State,* 130 Ga.App. 469, 203 S.E.2d 558, 562–63 (1973).

The defendants do not contend, nor did they in the trial court, that the executing officers found the items used as evidence during a search outside the legitimate scope authorized by the warrant or that the items' seizure did not meet the plain view exception to the warrant requirement. *See, e.g., State v. Sircy,* 215 Tenn. 1, 383 S.W.2d 37 (1964); *Armstrong v. State,* 548 S.W.2d 334, 336 (Tenn.Crim.App.1976). In fact, the defendants did not contest the state's assertion in the trial court that the officers had a right to seize the items given their knowledge of the particulars of the Phipps crimes, but only asserted that the general warrant prevented the state from searching the defendants' premises at all. Under these circumstances, we hold that the trial court properly allowed the camouflage cap, gloves, ski mask, nylon rope and plastic strap seized from Debra and Danny Meeks' residence into evidence at the trial.

**IV**

■ The defendants contend that the victim's mother, Shirley Phipps, should not have been allowed to testify during the state's case-in-chief that the victim told her at the jail after he had escaped from his captors that Billy Meeks was one of his assailants. They assert that the testimony was inadmissible hearsay and improper rebuttal evidence. The state responds that Mrs. Phipps' testimony was admissible to rehabilitate Roger Phipps' credibility and as a prior statement of identification pursuant to Rule 803(1.1), Tenn.R.Evid.

During the victim's direct examination, he testified that his mother was waiting for him at the jail and that he told her who had held him hostage. The state did not elicit from him the name of the assailant. On cross-examination, defense counsel asked the victim if he had told anyone at the jail that Billy Meeks was one of the assailants and he responded that he had told his mother. Then, defense counsel confronted him with his testimony at the preliminary hearing in which he said he had not told anyone at the jail about Billy Meeks' involvement. Also,

defense counsel sought to show that the victim did not think of the Meeks family being involved until after Doyle Phipps said that he had seen Danny Meeks making a telephone call. The obvious point sought to be made by the defendants was that the victim did not and could not identify Billy or Danny Meeks being his assailants even though he testified that he did and could.

In allowing the state to have Shirley Phipps testify regarding the victim's identification of Billy Meeks as an assailant, the trial court ruled that the testimony was admissible to rehabilitate the victim's credibility given the defendants' cross-examination of the victim. Also, it instructed the jury that the victim's statement to his mother was hearsay, not to be considered for the truth of the matter asserted, and should be considered only as rebuttal of the prior inconsistent statement.

 Ordinarily, it is impermissible to corroborate a witness' testimony by evidence of the witness making prior consistent statements, absent an impeaching attack on that testimony. *See State v. Braggs,* 604 S.W.2d 883, 885 (Tenn.Crim.App.1980). The defendants contend that the victim had not been impeached, only subjected to cross-examination. However, the impeaching attack which allows for corroboration may occur during cross-examination of the witness. *Sutton v. State,* 155 Tenn. 200, 291 S.W. 1069, 1070 (1927). By showing that the victim testified at the preliminary hearing that he did not tell anyone at the jail the identity of one of his assailants, the defendants were contending, in effect, that the victim's trial testimony was either fabricated or based upon faulty recollection. Under such circumstances, the victim's statement made before the inconsistent statement but which was consistent with his trial testimony was relevant to negate the defendants' attack. *See Dietzel v. State,* 132 Tenn. 47, 177 S.W. 47, 53–54 (1915); *Graham v. McReynolds,* 90 Tenn. 673, 18 S.W. 272, 277–78 (1891); *United States v. Coleman,* 631 F.2d 908, 914 (D.C.Cir.1980) (impeachment by suggestion of faulty recollection makes relevant a consistent statement made soon after the event when the matter was fresher in the witness' memory). Thus, the victim's

statement to his mother was admissible to corroborate his trial testimony. Because the trial court did not admit the statement as an exception to the hearsay rule, it is unnecessary for us to determine whether or not the statement qualifies as a hearsay exception under Rule 803(1.1)., Tenn.R.Evid.

## V

The defendants complain about testimony by telephone company employees through which the state proved that a computer tracing system determined that telephone calls to the Grundy County Jail at 11:25 P.M. November 26, 1989, and to the victim's home at 9:11 A.M. November 29, 1989, were made from the Scott's Service Station pay phone. The defendants contend that the computer-generated records were hearsay by not meeting the business records exception and that evidence of the tracing system's reliability should not have been allowed in rebuttal after the defense had rested.

Summer Deese, a technician with the Ben Lomand Rural Telephone Cooperative, testified about the computer-based tracing system which was used to determine the origin of calls to any given number. He explained that if a customer were receiving harassing calls and wanted to know the origin, a court order must be obtained and then the company would put a "nuisance call identification," formerly called a "trap," on the customer's line by means of the computer system. The computer would identify the telephone number where a given call originated, but it would not indicate who used the phone or how long the call lasted. Mr. Deese testified that, in the fall of 1989, he programmed the computer to trace telephone calls received at the Grundy County Jail. He stated that a colleague of his programmed a trace for Roger Phipps' phone number.

Pat Patton, a telephone company supervisor, testified about the computer printouts of the traces relevant to this case. He stated that the tracing device would report all incoming phone calls received at the victim's residence, but he did not have a report of the other calls that were received because he usually identifies only the calls that a customer requests. He stated that he had never

known the identification system to malfunction.

█ Billy Meeks called witnesses for the purpose of showing that the trace was mistakenly placed upon his mother-in-law's telephone line, the number for which was identical to the victim's except for a different last digit. He presented evidence reflecting telephone calls to his mother-in-law at the times which Mr. Patton said calls were made to the victim's house.

In rebuttal, Mr. Patton was called to explain a failsafe system which he said would prevent traces for one telephone number being reported for another number. The printouts reflected that the calls were traced from the victim's number.

As to the issue of the rebuttal testimony, we hold that it was admissible. Rebuttal evidence "is that which tends to explain or controvert evidence produced by an adverse party." *Cozzolino v. State,* 584 S.W.2d 765, 768 (Tenn.1979). It is within the sound discretion of the trial court to allow or reject rebuttal evidence. *State v. Green,* 613 S.W.2d 229, 234 (Tenn.Crim.App.1980). After the defendant's attempt to show that the tracing system had mistakenly registered calls to Billy Meeks' mother-in-law, it was entirely proper for the trial court to allow the state to prove the system's reliability.

█ The defendants' complaint that the computer printout information constitutes hearsay is based upon their contention that the printout record does not qualify under the business record exception to the hearsay rule as a record kept and made as a regular practice and duty of the business regarding the business activity. *See* Tenn.R.Evid. 803(6) and T.C.A. § 24–7–111. The defendants' contention raises a preliminary question of whether the printout even constitutes hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn.R.Evid. 801(c). Rule 801 defines statement and declarant as follows:

(a) *Statement.* A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion.

(b) *Declarant.* A "declarant" is a person who makes a statement.

The printout contained the date, day and time of a call, the number called and the number from which the call was made. Other testimony established the location of the telephones and to whom the numbers were assigned. Although a computer printout of information from a databank programmed into the computer by a person may be viewed as a person's statement for hearsay purposes, the printout of a telephone trace does not necessarily represent evidence of computer stored declarations other than the fact that a certain telephone number exists.

The leading case regarding hearsay and computer generated telephone tracing systems appears to be *State v. Armstead,* 432 So.2d 837 (La.1983) in which the court stated the following:

From our understanding of the record, however, we are not dealing with computer stored human statements or assertions which have been retrieved from the computer and introduced into evidence in printout form. The invention of electronic switching systems in telecommunications has eliminated the need for manual involvement in a telephone trace. Since the computer is actually responsible for making the telephone connection, the computer can be programmed to record the source of any incoming call. Thus, the printout of a telephone trace in this type of system does not represent evidence of computer stored declarations. The computer generated data by recording the source of various telephone connections as it was making them. Therefore, the evidence in this case was generated solely by the electrical and mechanical operations of the computer and telephone equipment, and was not dependent upon the observations and reporting of a human declarant.

*Id.* at 839–840. The court considered the printout to be a "self-generated record of its operations, much like a seismograph can produce a record of geophysical occurrences, a flight recorder can produce a record of physi-

cal conditions onboard an aircraft, and an electron microscope can produce a micrograph, which is a photograph of things too small to be viewed by the human eye." *Id.* at 840 (footnote omitted).

The role that the hearsay rule plays in limiting the fact finder's consideration to reliable evidence received from witnesses who are under oath and subject to cross-examination has no application to the computer generated record in this case. Instead, the admissibility of the computer tracing system record should be measured by the reliability of the system, itself, relative to its proper functioning and accuracy. *See, e.g., Penny v. Commonwealth,* 6 Va.App. 494, 370 S.E.2d 314, 316–317 (1988); *People v. Holowko,* 109 Ill.2d 187, 93 Ill.Dec. 344, 346, 486 N.E.2d 877, 879 (1985). In this case, the record reflects that persons with special knowledge about the operation of the computer system gave evidence about the accuracy and reliability of the computer tracing so as to justify the admission of the computer printouts. The rule against hearsay is not implicated.[2]

## VI

Billy Meeks contends that it was prosecutorial misconduct for the state to argue to the jury to the effect that the constitution protects against a defendant having to give voice exemplars to the state for testing purposes. He also complains about the trial court's refusal to instruct the jury that the state could have required the defendants to submit to voice exemplar examination. During closing argument, the defense commented about the state's resource for voice identification analysis, inferring that the state failed in some measure to use appropriate resources to prove its case. In response, the state argued:

> [The constitution] protects ... those three
> (3) defendants and I believe strongly in it,
> it protects them. They don't have to tell
> the state nothing. They don't have [to]
> give evidence against themselves. They
> don't have to give control tapes.

Upon Billy Meeks' objection, the trial court instructed the jury that it should not consider the attorneys' comments as statements of the law because the statements were merely part of the argument. It refused to give any further instruction to the jury regarding the matter.

 As a matter of law, the state's argument was incorrect. A defendant may be compelled to give evidence which does not have testimonial significance because such evidence is not protected by the constitutional privilege against self-incrimination. *Biggers v. State,* 219 Tenn. 553, 411 S.W.2d 696, 698 (1967), *aff'd.,* 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968); *Powell v. State,* 489 S.W.2d 538, 540 (Tenn.Crim.App.1972). In *United States v. Wade,* 388 U.S. 218, 222–223, 87 S.Ct. 1926, 1930, 18 L.Ed.2d 1149 (1967), the Supreme Court stated that the privilege against self-incrimination was not violated by compelling a defendant to speak and to utter words purportedly uttered by the assailant in order for witnesses to consider the utterances for identification purposes. Voice exemplars could have been required by the state. Also, it would have been better for the trial court to correct the state's misstatement, at least by noting that it was a wrong statement of law.

However, we do not view what happened as giving rise to such prejudice which would undermine our confidence in the verdicts returned. The argument was on a collateral issue, that is, concerning what the state could or could not do in developing evidence, and the trial court gave a limiting instruction regarding how argument should be received. The incorrect argument and lack of jury instruction about voice exemplars were harmless error at most.

## VII

Billy and Danny Meeks contend that the offenses of aggravated kidnapping and especially aggravated robbery should have

---

**2.** Although not raised in the trial court, a concern about the defendants' right to confrontation has been raised by them on appeal. *See State v. Henderson,* 554 S.W.2d 117 (Tenn.1977). Aside from the waiver of this issue, we note that the defendants confronted and cross-examined the witnesses who testified about the computer system's functioning and resulting printouts. There was no other witness to confront.

merged and resulted in their conviction for only one of those offenses. They rely upon their constitutional right against double jeopardy.

 However, in *State v. Anthony*, 817 S.W.2d 299, 300–301 (Tenn.1991), our Supreme Court held that the elements of kidnapping and robbery are separate and distinct in Tennessee and that prosecution, conviction and punishment for both offenses arising from one criminal event did not violate the constitutional protection against double jeopardy. Although *Anthony* dealt with the statutory elements of aggravated kidnapping and armed robbery existing before the wholesale changing of the substantive law in Tennessee in 1989, its reasoning applies in this case. Billy and Danny Meeks were convicted under T.C.A. § 39–13–301 (Supp.1989), aggravated kidnapping, and § 39–13–403, especially aggravated robbery. As with the statutes which were considered in *Anthony*, the elements of the statutory offenses involved in this case are not such that proving the elements of one offense necessarily proves the elements of the second offense. Thus, we hold that the legislature intended multiple punishments to be available under the circumstances of this case.

 In *Anthony*, our Supreme Court held, though, that due process under our state constitution may be implicated if multiple convictions and punishments occur and one of the convictions is for kidnapping, but the evidence reflects that the elements of the kidnapping were essentially incidental to the accompanying felony. 817 S.W.2d at 306. In reviewing this case under the analysis provided in *Anthony*, we determine that the victim's abduction and confinement were far from incidental to his being robbed. The multiple convictions and punishment did not violate these defendants' rights to due process and against double jeopardy.

## VIII

Billy and Danny Meeks contend that the trial court erred in imposing consecutive sentences. Billy Meeks' sentences for the aggravated kidnapping, especially aggravated robbery, and the extortion were ordered to be served consecutively for a total, effective sentence of thirty-nine years. Danny Meeks' sentences for the same offenses were ordered to be served consecutively for a total, effective sentence of forty-eight years. Their aggravated burglary sentences are to be served concurrently with their other sentences.

 Their complaint is that the trial court used the same factors both to enhance individual sentences and to justify consecutive sentencing. The trial court determined that (1) Danny Meeks is a professional criminal, (2) both have an extensive record of criminal activity, and (3) Billy Meeks is a dangerous offender as those classifications are described in T.C.A. § 40–35–115 and for which consecutive sentences may be imposed. Also, for any given offense, a sentence may be enhanced for various factors provided in T.C.A. § 40–35–114 relating to prior criminal history and to conduct involving the threat of serious bodily harm. There is no prohibition in the 1989 Sentencing Act against using the same facts and circumstances both to enhance sentences under applicable enhancement factors and to require those sentences to be served consecutively. In fact, this Court has previously held that consideration of prior criminal convictions and conduct for both enhancement and consecutive sentencing purposes is allowed. *State v. Davis*, 825 S.W.2d 109, 113 (Tenn.Crim.App.1991).

The judgments are affirmed.

WADE, J., and WILLIAM M. DENDER, Special Judge, concur.