.

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### FEBRUARY 1997 SESSION



FILED

August 22, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | |
|---|---|
| STATE OF TENNESSEE, ) | |
| ) | |
| Appellee, ) | C.C.A. No. 01C01-9601-CC-00002 |
| ) | |
| vs. ) | Williamson County |
| ) | |
| ANDREW WILLIAM BYERS ) | Honorable Donald P. Harris, Judge |
| and LARRY WAYNE KEY ) | |
| a/k/a LARRY WAYNE KING ) | |
| ) | (Aggravated Burglary, |
| Appellants. ) | Theft of Property) |
| ) | |

FOR THE APPELLANT BYERS:

JOHN HENDERSON
District Public Defender
P.O. Box 68
Franklin, TN  37065-0068


FOR THE APPELLANT KEY:

D. STUART CAULKINS
Attorney at Law
212 E. Main St.
Franklin, TN  37064

FOR THE APPELLEE:

CHARLES W. BURSON
Attorney General & Reporter

DARIAN B. TAYLOR
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

JOSEPH D. BAUGH, JR.
District Attorney General

MARK PURYEAR
Asst. District Attorney General
P.O. Box 937
Franklin, TN  37065-0937


OPINION FILED: _____


**AFFIRMED**


CURWOOD WITT
JUDGE


**OPINION**

The defendants, Andrew William Byers and Larry Wayne Key,[1] were convicted of aggravated burglary and theft of property by a jury of their peers in the Williamson County Criminal Court. Byers received a 24 year effective sentence for his crimes -- 12 years for aggravated burglary, a Class C felony, at Range 3, and 12 years for theft of property, a Class D felony, at Career Offender status. These sentences were imposed consecutively, for an effective 24 year sentence. Key received a 27 year effective sentence -- 15 years for aggravated burglary, a Class C felony, at Range 3, and 12 years for theft of property, a Class D felony, at Career Offender status. Both defendants' sentences were imposed consecutively to each other and to the sentences they were serving at the time of the convictions. In this appeal, both defendants raise issues pertaining to the sufficiency of the convicting evidence. Byers also raises an issue pertaining to the trial court's denial of his pre-trial motion to suppress evidence seized from his home. We affirm.

On March 11, 1993, numerous items were taken from the Brentwood home of Dan and Tammy Beeler. Entry was obtained by prying open a back door. Among the items taken from the home were a gold Cross pen and pencil set, a Honda jacket, a fraternity jacket, several baseball caps with distinctive lettering and markings, a pair of cowboy boots, a "paint ball" gun and "paint ball" equipment. Mrs. Beeler discovered the burglary during the afternoon hours when she returned home from work. She notified the Brentwood Police Department, and Detective Thomas Campsey began an investigation.

As a result of surveillance activities growing out of an investigation of

---

[1]Key has apparently used the alias "Larry Wayne King." He is named in the presentment as "Larry Wayne Key." In accord with the policy of this court, we use the defendant's name as it appears in the presentment. See, e.g., State v. Jenny Wilson, No. 03C01-9508-CC-00221, slip op. at 2, n.1 (Tenn. Crim. App., Knoxville, Apr. 24, 1996).

an unrelated offense, Nashville Metro officers were aware Defendant Byers was living in a rental duplex in south Nashville, and Key had been seen entering and leaving the Byers residence. Arrest warrants were obtained for the two, and they were arrested on March 22, 1993, as they drove away from Byers' residence. Within a few hours, a warrant authorizing the search for items relevant to the unrelated offense was executed at Byers' home by Nashville Metro officers. According to the evidence adduced at the hearing on the motion to suppress, the officers found other items which they suspected were the fruits of one or more burglaries in Williamson County in the course of executing this search warrant. One of the Nashville Metro officers involved in searching the Byers home was Detective Mike Chastain, who was familiar with the burglaries on the Davidson/Williamson County line, and who had been in contact with Det. Campsey regarding the crimes. From these communications, Chastain was aware of the paint ball gun and accessories missing from the Beeler home. He found items matching this description in plain view in a bedroom of the Byers home, and he confirmed they were those taken in the Beeler burglary by telephoning Campsey and confirming the serial number on the paint ball gun. Other officers then inquired whether other items which they had come across during the course of the Byers search matched property which had been reported missing as a result of the Williamson County burglaries. Campsey testified one such inquiry was from Det. Harry Boner, who asked whether Campsey was missing any cowboy boots, as Boner found a pair of boots in a boot bag during the search. Campsey advised a pair of size 10-1/2 brown leather Dan Post boots had been taken from the Beeler residence. The paint ball equipment and boots were seized by the Metro officers. Additionally, one of the officers spotted a fraternity jacket belonging to Dan Beeler in the Byers residence, although he was unaware it was stolen property until he described it to Det. Campsey after the search was completed.

3

A second search warrant was obtained for the Byers residence at the request of Det. Campsey, probable cause being supported by stolen property discovered in the first search. When that warrant was executed, no further evidence was found, although additional items taken in the Beeler burglary were recovered with the consent of a neighbor, James Gentry, who admitted moving items from the Byers residence to his own residence after Byers was arrested. These items consisted primarily of jackets and hats with unique markings.

At the time the defendants were arrested, a gold Cross pen was found on the person of Key.

The defendants were charged in a four-count presentment with two counts each of aggravated burglary and theft of property valued over $1,000 of the Beeler residence and a second residence in the Beeler neighborhood. The counts pertaining to the two residences were severed for trial.

At trial, the state's evidence consisted of the testimony of the Beelers, James Gentry, who was Byers' cousin and neighbor, and various law enforcement officers. Dan Beeler testified to the condition of his home following the burglary and the items missing. He estimated 50 items valued at a total of $3,400.79 were taken. He recovered some of the items taken from his home, including the paint ball equipment, the cowboy boots, various jackets and hats, a gold Cross pencil, an air compressor, and tools. He also testified he visited the Metro impound lot, where he identified the air compressor, tools and a gold Cross pen or pencil which were inside a Mazda truck seized from Byers' residence.

Tammy Beeler's testimony was essentially corroborative of that of her ex-husband, Dan Beeler. She estimated the value of the stolen property at $3,200

4

to $3,400.

Detective Mike Chastain testified regarding his communication with Det. Campsey about burglaries on the Davidson/Williamson County line during the relevant time period. He also recounted his involvement as a member of the team of officers who executed the first search warrant on the Byers residence and his discovery of the paint ball equipment in plain view in the bedroom he was assigned to search. He recognized it as the same type of property Det. Campsey had previously described to him, and he confirmed that the property was stolen by phoning Campsey and matching the serial number on the gun. He also testified that as a result of an investigation of the defendants, he was aware Byers resided at the address which was the subject of the two search warrants. Chastain also testified about returning to the residence with the second search warrant, finding nothing, and obtaining consent to search James Gentry's house next door, where several items taken in the Beeler burglary were discovered. He testified that the Mazda truck that was later searched at a tow-in lot and that is shown in the photograph marked as Exhibit 22 was discovered in the driveway at the Byers residence.

Norris Tarkington, another member of the Metro force, testified he conducted a personal search of Key as part of the arrest process and inventoried the items found. One of the items was a gold Cross pen that appears in the photograph marked as Exhibit 14.

James Gentry testified he is Byers' cousin and lived next door to him in March 1993. As a result of Byers' arrest, Gentry obtained a key to Byers' home and entered the home to get Byers' bird for the purpose of feeding him. He also took some personal property and put it in his own home. He saw the officers

5

conducting both searches of the Byers home, and he was asked by Campsey at the time of the second search whether he had taken property from the Byers home. Gentry admitted he had and allowed Campsey and Chastain into his home, where they discovered additional stolen property.

Metro Detective Harry Boner testified he was involved in the investigation of the defendants and participated in the first search. He found the cowboy boots in a boot bag in the attic. He had not personally talked with Campsey prior to execution of the search warrant, but he knew Chastain and Campsey had been in communication about burglaries in Williamson County.

Detective Campsey testified he is often in communication with law enforcement officials from other jurisdictions because much of the crime perpetrated on the residents of Brentwood is committed by residents of other parts of Williamson County or Davidson County, particularly South Nashville. He recalled discussing with Chastain the paint ball gun taken from the Beeler burglary. This was an unusual item. He confirmed his telephone conversation with Chastain about the paint ball gun during the execution of the first search warrant. He corroborated Chastain's and Gentry's testimony regarding the second search warrant and the discovery of several items of stolen property in Gentry's home. He confirmed additional stolen items were recovered from the truck impounded by Metro, including a leatherette tool kit, an air compressor, and a gold pen. He testified that both the pen and pencil were recovered, and he was present when one of the two was returned to Mr. Beeler. He also testified the surface of a Cross pen or pencil was not conducive to recovery of fingerprint evidence.

The trial court denied both defendants' motions for judgment of acquittal. Neither defendant elected to present proof.

The jury returned findings of guilt of aggravated burglary and theft of property valued at over $1,000 as to both defendants. The jury assessed fines of $10,000 for each defendant for aggravated burglary and $5,000 for each defendant for theft of property.

Byers, a Range 3 offender on the conviction of aggravated burglary, a Class C felony, was sentenced to 12 years. For theft of property, a Class D felony, he was classified as a Career Offender and given a 12 year sentence. These sentences were imposed consecutively, for an effective 24 year sentence. Key, a Range 3 offender for the aggravated burglary conviction, received 15 years. He was classified a Career Offender for the theft of property conviction and sentenced to 12 years. His sentences were likewise imposed consecutively, for a 27 year effective sentence. Both defendants were ordered to serve these sentences consecutively to those for which they were incarcerated at the time of sentencing, and the fines imposed by the jury were set aside.

I

Both Byers and Key allege the evidence adduced at trial is insufficient to sustain their convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

7

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); State v. Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

A. Byers.

**8**

Byers contends there is no evidence he entered a habitation or any portion thereof or that he obtained property owned by the victims, essential elements of aggravated burglary and theft of property, respectively. Therefore, he argues the state's proof at trial was fatally deficient and he is entitled to reversal of his convictions. In support of this argument, he cites a passage from Corpus Juris Secundum for the proposition that a conviction is not proper on circumstantial evidence alone. This is not the law in Tennessee. See, e.g., Duchac, 505 S.W.2d 237.

The evidence in the light most favorable to the state is that several items of the Beelers' stolen property were found in the Byers home, from which Byers and Key had just departed when they were arrested. Byers' cousin led authorities to additional stolen property he admitted removing from Byers' home. A truck seized from Byers' driveway likewise contained items belonging to Dan Beeler.

The evidence presented by the prosecution was sufficient to show Byers was in possession of property recently stolen in a burglary. It has long been the law in this State that proof of the possession of recently stolen goods, if not satisfactorily explained, gives rise to the inference that the possessor has stolen them, Bush v. State, 541 S.W.2d 391 (Tenn. 1976); State v. Land, 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984), and has committed the burglary antecedent to the theft. State v. Hamilton, 628 S.W.2d 742, 746 (Tenn. Crim. App. 1981) (citations omitted). In this case, no explanation whatsoever was offered, and the jury was certainly within its province in finding Byers guilty of each and every element of the offenses by inference from his possession of the stolen property at

**9**

a time proximate to the burglary and theft.[2] In short, the facts and circumstances of this case present no other reasonable hypothesis for Byers' possession of the property save his guilt of the crimes of which he was convicted. Thus, the evidence sufficiently supports Byers's guilt of the crimes of aggravated burglary and theft of property.

### B. Key.

Key contends his possession of a Cross pen or pencil at the time of his arrest is insufficient proof he knowingly obtained the implement in the Williamson County burglary of the Beeler residence. We agree. However, his mere possession of a pen or pencil of the type stolen is not the only basis supporting his convictions, and although the issue raised makes it a close case, we affirm for the reasons given below.

The probative links between Key and the Beeler burglary are the discovery of a gold Cross pen on his person at the time of his arrest, the discovery of the second piece of the stolen Cross pen and pencil set, and his keeping company with Byers. On March 22, 1993, he was seen at the Byers residence and was with Byers when they were detained and arrested on that date. Concerning the pen, some facts were clearly shown. After the burglary, Mr. Beeler reported the theft of a number of items, including a box containing a gold Cross pen and pencil set. The two pieces were matched and were not only similar in appearance to each

---

[2]We have considered whether the eleven day period between the Beeler burglary and law enforcement's discovery of the defendants in possession of the Beelers' property constitutes possession of "recently stolen property." On the facts of this case, we hold it does. See State v. Anderson, 738 S.W.2d 200, 202-05 (Tenn. Crim. App. 1987); cf. State v. Sheila Elaine Thomas, No. 01C01-9304-CC-00131 (Tenn. Crim. App., Nashville, Feb. 23, 1996) (property recovered in defendant's home two to three months after burglaries in question), perm. app. denied (Tenn. 1996); State v. Donald Ray Veasley, No. 01C01-9404-CC-00153 (Tenn. Crim. App., Nashville, Nov. 15, 1995) (12 days), perm. app. dismissed (Tenn. 1996).

other but were similar in appearance to other gold Cross pens and pencils. They bore no engraving, and Mr. Beeler could articulate no distinctive markings of any kind. After the officers recovered some of the Beeler property, the pencil but not the pen was returned to Mr. Beeler. Neither item was physically offered into evidence; rather, the state offered photographs which Mr. Beeler and other witnesses testified depicted one or the other piece of the Cross set. Exhibit 14 depicted a Cross instrument in a plastic bag, but Mr. Beeler testified he could not discern from the picture whether the bag, which was held by Metro Police at their evidence room, contained a pen or a pencil. Exhibit 22 depicted some items placed on the top of a side rail of a Mazda pick-up truck, and although the items depicted cannot be discerned in the photograph, Mr. Beeler testified that the picture shows one of the pieces of the Cross set that was found in the truck.

Beyond these facts, the state's proof was chaotic, if not confusing. While Detective Campsey testified that Mr. Beeler identified both Cross items, one at the tow-in lot where the Mazda was located and one at the Metro evidence room, Mr. Beeler did not specify in his testimony which of the two Cross items he viewed at each location. He testified merely that one of the pieces was viewed at the tow-in lot and one was viewed in the evidence room two days later, although at one point, he casually says that the pen is depicted in Exhibit 22, the picture taken at the tow-in lot. However, he does testify that one of the items was a pen and one was a pencil. Detective Tarkington, who assisted in Key's arrest, testified unequivocally that he found a gold Cross pen on Key and that this pen is the item depicted in Exhibit 14. On the other hand, Detective Campsey, who accompanied Beeler to the tow-in lot and who apparently photographed the Mazda truck and then delivered to Metro the personal items found in the truck, testified once that Exhibit 14 shows the pencil and once that it shows the pen. Furthermore, he testified once that Exhibit 22 shows the pen or pencil and twice that it shows the pen. Compounding that

**11**

confusion, he testified that on April 8, 1993, he saw another detective return the pen to Mr. Beeler but later testified that on April 8 the pencil was returned to Mr. Beeler.

The Mazda truck shown in Exhibit 22 was discovered in the driveway at the Byers residence on March 22. It was towed to the lot where Campsey and Beeler discovered inside the truck a tool kit and an air compressor belonging to Mr. Beeler and a gold Cross pen or pencil. There was no proof as to the ownership of the truck nor as to the use or control of it by either Byers or Key.

Mr. Beeler's conclusory testimony that the Cross items shown in the photographs were his property, as well as Campsey's testimony that Beeler personally inspected and identified each Cross item as being his (Beeler's) own, cannot be effective to establish Beeler's ownership of these very items. There were no distinguishing features. Mr. Beeler even had difficulty distinguishing between the pen and the pencil. We conclude, therefore, that if the Cross item found on Key is to be linked to the Beeler burglary, it must be done circumstantially, the fact that Key possessed a pen or pencil of the type stolen being, of course, one of the circumstances.

The evidence, viewed in the light most favorable to the state, supports the following findings: (1) Based upon Tarkington's unequivocal testimony, the item found on Key's person, being the one that appeared in Exhibit 14, was the pen. (2) One item was a pen and one was a pencil, and consequently, the item recovered from the truck, the one depicted in Exhibit 22, was necessarily the pencil. (3) The pencil was discovered in a vehicle that was parked at the Byers residence. (4) Other property items which were stolen from the Beelers were found in the truck and in the Byers residence. (5) Eleven days after the Beeler burglary, Key was seen at the Byers residence, and on that same day, Byers and Key were together

when they were arrested.  Also, on the same day, the Mazda truck was seized.

Although the question of the sufficiency of the circumstantial evidence supporting a finding that Key possessed Mr. Beeler's pen is a close one, we conclude that the evidence is sufficient based upon grounds that are not revealed in the defendant's brief and not argued by the state.  The fact that we find to be controlling is the juxtaposition of the two pieces of the Cross set.  It is critically important that the state established that one recovered Cross item was a pencil, shown to have been found in the truck, and one was a Cross pen, found on the defendant Key.  The convergence of these facts justifies the trier of fact in finding that it was Beeler's pen that was found in Key's possession.  In our view this conclusion could not be reached had not the pen and pencil have been accounted for separately.  It takes the presence of the pencil, found among other items known to have been stolen from Mr. Beeler, to complement and supply meaning to the discovery of the pen.

The state having proven to our satisfaction that defendant Key possessed property stolen from Mr. Beeler, the same inference about the possession of recently stolen property that supports Byers' convictions supports the convictions of Key.  See Bush, 541 S.W.2d 391; Land, 681 S.W.2d at 591; Hamilton, 628 S.W.2d at 746.  Key chose to let the state's case stand or fall based upon its own strength.  The possession of the pen was unexplained.  Based upon our finding that the state's case "stands," the conviction is supported by sufficient proof.

## II

In an issue raised by Byers alone, he challenges the trial court's denial of his motion to suppress the evidence seized which was outside the scope of the

13

first search warrant, that is, the paint ball equipment and cowboy boots. On appellate review, a trial court's denial of a motion to suppress will be upheld unless the evidence preponderates against the lower court's findings. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

The first search warrant executed on Byers' house authorized a search and seizure of

> A semi-automatic pistol, shotgun, a Lima .22 semi-automatic pistol, chrome plated, with engraving on the barrel and white grips, gray duct tape, a gold nugget ring, brown leather style jacket, black sweatshirt, black ski mask, brown with white stripe [sic] ski mask, sunglasses with strings attached, flex cuffs.

Byers argues the officers' impermissibly broad search of his home beyond the confines of the warrant constituted the execution of a general warrant, in contravention of the U.S. and Tennessee Constitutions. However, in Tennessee, the prohibition against general searches does not per se prohibit law enforcement officers who are involved in the lawful execution of a search warrant from seizing other property used in a crime which is not described in the warrant. See State v. McColgan, 631 S.W.2d 151, 155 (Tenn. Crim. App. 1981) (citation omitted).

The state urges that the issue of the seizure of the paint ball equipment is resolved by reference to the plain view doctrine. Byers does not directly attack the applicability of the plain view doctrine; rather, he contends generally the evidence at the suppression hearing did not establish the reasonableness of the seizure of the property. We agree with the position advanced by the state.

In its most general terms, the plain view doctrine allows law enforcement officials to seize items in "plain view" while executing a search warrant naming other objects. See Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct.

**14**

2022 (1971). In Tennessee, the plain view doctrine applies where (1) the objects seized were in plain view; (2) the viewer had a right to be in position for the view; (3) the discovery of the seized object was inadvertent, and (4) the incriminating nature of the object was immediately apparent. State v. Horner, 605 S.W.2d 835, 836 (Tenn. Crim. App. 1980) (citing Armour v. Totty, 486 S.W.2d 537, 538-39 (Tenn. 1972)). The Supreme Court dispensed with the inadvertent discovery requirement in Horton v. California, 496 U.S. 128, 110 S. Ct. 2301 (1990). In addition, the police must have the right to be in the position to seize the item. Horton, 496 U.S. 137, 110 S. Ct. 2308.

Detective Chastain, who was in Byers' home executing a search warrant, saw the paint ball equipment in plain view. He was aware from discussions with Det. Campsey that this type of property was missing from a home in Williamson County. According to Det. Campsey, the property was something out of the ordinary. Based on this knowledge, Det. Chastain proceeded to confirm the identification of the equipment by telephoning Det. Campsey while at Byers' home. These facts sufficiently meet the test of the plain view doctrine. The seizure of this property was supported by probable cause,[3] and the trial court correctly declined to suppress the evidence.

On the issue of suppression of the cowboy boots, Byers argues the search went so far afield of the search warrant that it was an impermissible general search. The state simply concedes there was no direct evidence at the suppression hearing that the cowboy boots were in plain view, but their admission was harmless error. We depart from the positions advanced by both parties and hold the search for the items in question necessarily brought the cowboy boots into plain view.

---

[3]See, e.g., Jennings v. Rees, 800 F.2d 72 (6th Cir. 1986).

**15**

A review of the search warrant discloses that by the very nature of some of the items described, they are small and easily concealable in closed containers or small spaces and would necessarily require officers to conduct a more detailed search than would be mandated if the objects were larger items.[4] This court has previously said that law enforcement officers in the course of search warrant execution "have lawful access to all locations on [the searched] property which can reasonably contain the items specified in the . . . warrant." State v. Meeks, 867 S.W.2d 361, 373 (Tenn. Crim. App. 1993) (in context of discussion of where officers may search pursuant to a warrant that is only partially valid); see also Horton, 496 U.S. 128, 110 S. Ct. 2301 (search not unreasonable where officers searching for items including three gold coin rings discovered weapons of type used in crime); 2 Wayne R. LaFave, Search and Seizure § 4.10(d) (police may look into containers such as bags, pouches, bottles, briefcases, and the like "if at least one of the items described in the warrant as an object of the search could be concealed therein").

The evidence at the suppression hearing reflects Campsey talked with Boner during the search, and Boner inquired whether Campsey was missing any cowboy boots, as he found a pair of boots during the course of the search. The record does not reflect whether Boner immediately inquired whether boots had been stolen in Williamson County upon finding the bag or whether he opened the bag to continue to search for the items covered by the warrant and thereafter inquired about the boots. This discovery was made during the search. Several of the items described in the search warrant could be concealed inside a pair of boots or a boot bag. No matter whether Boner saw the boots and bag and made his inquiry or whether he opened the bag to continue his search and later made the inquiry, the

_____

[4]For example, a law enforcement officer acts reasonably in conducting a more intrusive search for a gold nugget ring than a lawnmower.

**16**

cowboy boots and their bag necessarily came into plain view during the lawful execution of the search warrant. Under either set of circumstances, it is apparent the seizure of the boots was based upon probable cause.

In reaching our conclusion that the search warrant execution in this case was not unduly broad, we factually distinguish our decision from that in State v. Meeks, 876 S.W.2d 121 (Tenn. Crim. App. 1993). In Meeks, the officers executing the search warrant allowed an officer from another jurisdiction who was in no way related to the investigation to which the search warrant pertained to accompany them to the search situs. Thereafter, the searching officers seized evidence at the direction of the non-searching officer which pertained to another crime. In holding the lower court should have suppressed the evidence obtained in this manner, we focused on the lack of a causal connection between many of the seized items and the crime which was the subject of the search warrant, as well as the lack of inadvertent discovery by the officers. Meeks presented a situation where a limited search warrant was essentially converted into a general warrant because the officers went into the premises with the apparent expectation of finding items outside the warrant. They went so far as to allow an officer with no connection to the search warrant to use their search warrant to further his own investigation of a separate crime. In contrast, where the searching officers are aware of the possibility of finding evidence of other crimes, and upon discovering such evidence at the search situs proceed to seize it, the seizure is reasonable. See McColgan, 631 S.W.2d at 154-55.

In summary, the evidence does not preponderate against the trial court's denial of Byers' motion to suppress.

The judgment of the trial court is affirmed.

**17**

_____
CURWOOD WITT, JUDGE


CONCUR:



_____
GARY R. WADE, JUDGE


_____
DAVID G. HAYES, JUDGE