IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 6, 2001

## STATE OF TENNESSEE v. CARL JOHNSON and DERRICK SUTTON

**Appeal from the Criminal Court for Shelby County**
**No. 99-01831     James C. Beasley, Jr., Judge**

---

**No. W2000-00278-CCA-R3-CD  - Filed April 4, 2001**

---

The defendants, Carl Johnson and Derrick Sutton, were each convicted by a jury of especially aggravated robbery.  Johnson raises three issues on appeal: (1) whether the evidence was sufficient to support his conviction for especially aggravated robbery; (2) whether the trial court erred in denying his motion for severance; and (3) whether the trial court erred in sentencing him to the maximum sentence of twenty-five years. Sutton challenges the sufficiency of the convicting evidence.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Howard Brett Manis, Memphis, Tennessee, for the appellant, Carl Johnson.

A C Wharton, Jr., Shelby County Public Defender, and Garland Ergüden, Assistant Public Defender (on appeal) and Charles D. Wright, Memphis, Tennessee (at trial) for the appellant, Derrick Sutton.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; Karen Cook, Assistant District Attorney General; and Reginald R. Henderson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendants, Carl Johnson and Derrick Sutton, appeal as of right from their jury convictions in the Criminal Court of Shelby County for especially aggravated robbery, a Class A felony.  Johnson was sentenced as a Range I, violent offender to twenty-five years imprisonment, and Sutton was sentenced as a Range I, violent offender to twenty-one years imprisonment.  Both defendants contend that the evidence is insufficient to support their convictions.  Additionally,

Johnson contends that the trial court erred in denying his motion for severance and in sentencing him to the maximum possible sentence within the range. We affirm the judgments of conviction.

The defendants were each indicted for one count of especially aggravated robbery and one count of criminal attempt to commit first degree murder for the August 30, 1998 robbery and shooting of Anthony Hendrix in Memphis, Tennessee. The evidence presented at their joint trial was that on August 29, 1998, the defendants and two female acquaintances, Treasy Alsobrook and Toshia Rainey, developed a plan to rob the victim when he arrived at Ms. Alsobrook's house later that evening for a date. The evidence further showed that in the early morning hours of August 30, 1998, the defendants executed the plan, robbing the victim as he sat in his car waiting for Ms. Alsobrook and shooting him twice as he fled from the car.

Treasy Alsobrook testified as follows: Early on the afternoon of August 29, 1998, the victim drove by her house, gave her his beeper number, and asked her to meet him later in the day. After the victim left, Ms. Alsobrook's cousin, Toshia Rainey, arrived, and Ms. Alsobrook informed her of her conversation with the victim. Ms. Alsobrook and Ms. Rainey went to Derrick Sutton's house, where they visited with Sutton and Carl Johnson. During the course of that visit, the four developed a plan to rob the victim.

Ms. Alsobrook testified that in accordance with their plan, she telephoned the victim and asked if he would take her out to eat. He agreed, and Ms. Alsobrook and Ms. Rainey returned to Ms. Alsobrook's house to wait for the victim. When the victim arrived around 1:00 a.m, Ms. Alsobrook got into his car, and he began to drive down the street. She asked him to stop, telling him that she wanted to investigate an unfamiliar car in her backyard. He complied, waiting in his car as she got out, walked to her house, checked the backdoor, and then returned. She was about to get back into the victim's car when Sutton, in a show for the victim's benefit, came up behind her, put a gun to her head, grabbed her, and ordered her to sit on the curb with her head down. Sutton then got into the front passenger side of the car, followed by Johnson, who got into the backseat. According to Ms. Alsobrook, both defendants were armed with handguns. Ms. Alsobrook heard the defendants ask the victim for money and then heard the victim being hit on the head with a gun. The victim got out of the car and began running, and Ms. Alsobrook heard gunfire. She looked up to see Johnson shooting at the fleeing victim, who stumbled, as if about to fall. Afterward, Sutton laid his gun on her front porch, and the two defendants got into their car parked in her backyard and drove away. Shortly thereafter, the police arrived and arrested her.

On cross-examination, Ms. Alsobrook acknowledged that she participated in the robbery by luring the victim to her house, knowing that he was interested in having sexual intercourse with her. She denied that she was promised a deal in exchange for her cooperation with police, but admitted that she told the police that she was involved in the plan against the victim only after hearing that the victim might die and that Ms. Rainey was blaming her for the offenses. She acknowledged that she was indicted only for facilitation of especially aggravated robbery and that she hoped to receive probation because she was pregnant.

The victim provided essentially the same account as Ms. Alsobrook regarding his afternoon meeting with Ms. Alsobrook at her house, their subsequent telephone communication, and his arrival at her house for the date. He further testified as follows: As he waited outside Ms. Alsobrook's house in the early morning hours of August 30, he noticed two men but did not pay them much attention. After Ms. Alsobrook came out of the house and got into his car, he began to drive away but stopped when she told him that she wanted to check a strange car in her backyard. He became uneasy when he saw Ms. Alsobrook peer into a window of her house, rather than at the car in the backyard. He said that he locked the driver's door of his car and decided to drive away when Derrick Sutton suddenly opened the passenger door, held a gun on him, and ordered him to "drop it off."

The victim testified that he pushed the gun away and gave Sutton $690. Sutton took the money and ordered the victim to pull his shirttail over his head and not to look at him. Another man entered the backseat of the car, and Sutton went to the front passenger seat. As Sutton held the gun on the victim and rummaged through the car's glove compartment, the man in the backseat hit the victim in the back of the head three times with a gun, saying "make that call, bitch" and "bitch, you think we're playing with you, don't you?" From his voice, the victim recognized the man in the backseat as Carl Johnson, a man with whom he had gambled and from whom he had recently won a large sum of money.

The victim testified that he jumped out of the car and ran toward a wall. When he jumped on the wall, he heard gunshots, realized he had been shot, and started spitting up blood. He kept going, however, and managed to escape by falling over a fence and running in a zigzag pattern down the street to a neighborhood house, where he waited until an ambulance arrived. The victim testified that he experienced a lot of pain from his two gunshot wounds and that two or three months passed before he was able to resume his normal activities.

The victim testified that he viewed a series of photographs and identified the defendants as the men who robbed him. He said that he wrote on the reverse side of Sutton's photograph, "This is the first gunman to get in my car and rob me" and on the reverse side of Johnson's photograph, "This is the second gunman to get in my car. I've known him for ten years and that is how I recognized his voice." Also, the victim identified both of the defendants in the courtroom as the men who robbed him. He admitted that his identification of Johnson was based solely on his recognition of Johnson's voice. He denied having learned of Johnson's role in the robbery from Ms. Alsobrook's mother, insisting that he had immediately recognized Johnson's voice when Johnson spoke to him from the backseat of the car.

Nakeeta Thompson, Ms. Alsobrook's neighbor, testified as follows: Between 1:00 and 1:30 on the morning of the robbery, she heard six to eight gunshots. When she looked out the window, she saw Ms. Alsobrook sitting on the curb with her head between her legs. As she watched, two men ran to Ms. Alsobrook's front porch to lay down a gun and then to a car parked behind Ms. Alsobrook's house. Although unable to see their faces, Ms. Thompson was able to determine that the men were African-American, about nineteen or twenty years old, of medium height, and wearing dark pants and white T-shirts. As the men drove away, she saw Ms. Alsobrook rise and walk

hurriedly away from the house while Ms. Rainey came out to the front porch and retrieved the gun. Ms. Thompson went outside with her cordless telephone to see if anyone needed help and whether she should call 911. Approximately five minutes later, Ms. Thompson saw Ms. Alsobrook in her car.

Phillip Collins, Johnson's cell mate in the Shelby County Jail for four months in 1999, testified as follows: Johnson told him that he had gotten close to seven hundred dollars by robbing the victim. According to Collins, Johnson said that a woman "beeped" the victim to ask him to take her out. When the victim arrived at the woman's house, Johnson sneaked around his car, crept into the backseat, "smacked" the victim's head with a pistol, and demanded money and drugs. Johnson told him that the victim tried to run and that he fired five or six shots at him, from both inside and outside the car, until his nine-millimeter gun jammed. Johnson related that he chased the fleeing victim. Johnson told Collins that the victim fell but got up and jumped a fence to escape.

On cross-examination, Collins admitted that Johnson told him "several different stories of how he was going to try to get off." Collins acknowledged that he was a convicted felon and that he would have had access in the jail cell to all discovery materials that Johnson's lawyer provided Johnson. He admitted that the prosecutor's investigator had agreed to attempt to expedite his pending indictment and to include a note in Collins' file, detailing his cooperation in the case.

Officer B. G. Jennings, a twenty-one-year veteran of the Memphis Police Department and a member of the Crime Scene Unit, identified photographs that he took of the crime scene, including photographs of spent nine-millimeter shell casings that were found on the floorboard of the victim's car and of a live nine-millimeter round discovered on the street. Officer Jennings acknowledged that the shell casings were the only evidence that a gun had been fired inside the car and that the casings could possibly have been in the vehicle for weeks. He admitted that no fingerprints were recovered from the vehicle.

Officer Mark Rewalt of the Memphis Police Department testified as follows: He recovered a .357 caliber Smith and Wesson revolver from underneath a bed in Ms. Alsobrook's house. The weapon contained one live round and five spent casings. He stated that when a .357 revolver is fired, the spent casings remain in the weapon until they are removed, while spent casings from automatic weapons are automatically ejected either straight up or to either side at an angle.

Sergeant Reginald Morgan of the Memphis Police Department's Robbery Squad testified that he was in charge of the investigation of the case. As part of his investigation, he talked with Derrick Sutton, who gave a statement in which he admitted to robbing the victim. Sutton's redacted statement, from which all references to Johnson were removed, was read into evidence. The statement revealed that Sutton participated in the robbery of the victim on August 30, 1998, around 1:38 a.m. Sutton described his role in the robbery as that of a gunman and said that he was to take the money from the victim. He said that Toshia Rainey set up the robbery and supplied him with a .357 chrome gun and that Treasy Alsobrook lured the victim to the house. Sutton said that the victim came to Ms. Alsobrook's house as planned and that Ms. Alsobrook got into his car. He said that

-4-

after Ms. Alsobrook got out of the car, he entered the car and the victim gave him money. He said that a few seconds later, the victim jumped out of the car and started running. Sutton said that he heard a gunshot as he tried to get out of the car through the passenger's side door. Unable to exit the passenger's side, he left through the driver's door and ran to Ms. Alsobrook's porch. He said that he saw the victim running down the street. He said that he laid the gun on the porch, got into his car, and went home.

The State's final witness was Ann Smith, custodian of the medical records of the Regional Medical Center at Memphis, the hospital to which the victim was taken for treatment of his gunshot wounds. Ms. Smith testified that the victim's medical records showed that he was admitted on August 29, 1998, with gunshot wounds to the left arm and left chest and was discharged in stable condition on August 30, 1998, with instructions to take one to two tablets of Percocet every four to six hours for pain and to return in one week. Ms. Smith acknowledged that the August 29 admission date was an error, because the victim's emergency room report indicated that he was brought into the trauma unit at 2:17 a.m. on August 30. She further acknowledged that the victim's condition was listed as stable when he was admitted to the critical care unit of the hospital and that he was kept for only twenty-three hours for observation. Her records reflected that the victim returned to the surgery clinic two weeks later and that his wounds had healed. She had no record of any further medical treatment.

The defendants elected not to testify, and no proof was presented by the defense. Following deliberations, the jury convicted each defendant of one count of especially aggravated robbery but was deadlocked on the charges of criminal attempt to commit first degree murder. Finding both defendants to be Range I, violent offenders, the trial court sentenced Johnson to twenty-five years and Sutton to twenty-one years for their especially aggravated robbery convictions.

## I. SUFFICIENCY OF THE EVIDENCE

Both defendants challenge the sufficiency of the convicting evidence. Although he acknowledges that some evidence exists to support his conviction, Sutton argues that the evidence presented was simply not sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt. In this regard, Sutton questions the credibility of state witnesses such as Ms. Alsobrook and Mr. Collins. Johnson contends that the evidence was insufficient to support his conviction because the proof did not show that the victim suffered serious bodily injury, an essential element to the offense of especially aggravated robbery.

Our standard of review when the sufficiency of the evidence is challenged on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

In particular, questions regarding the credibility of witnesses are resolved not by this court, but by the trier of fact. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The defendants were convicted of especially aggravated robbery, which requires that the robbery be accomplished with a deadly weapon and that the victim suffer "serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (1997). "Serious bodily injury" is defined as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34) (1997).

Johnson argues that the evidence at trial failed to show that the victim's injuries involved a substantial risk of death or caused the type of extreme physical pain required for serious bodily injury. He contends that evidence that the victim was admitted to the hospital in stable condition and released after only twenty-three hours of observation demonstrates that his wounds could not have been life threatening. He further contends that the evidence was not sufficient to prove that the victim experienced "extreme physical pain" from his injuries. The state argues that the proof reveals that the victim, who was struck on the head three times and shot twice, was admitted to the critical care unit of the hospital and testified that he had been in severe pain and unable to resume his normal activities until several months after the shooting.

In State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995), this court applied the ejusdem generis doctrine of statutory construction to explain that the "extreme physical pain" definition of serious bodily injury must be read as applying to the same class of injury as those causing a substantial risk of death, protracted unconsciousness, protracted or obvious disfigurement, or the protracted loss or substantial impairment of a bodily member, organ or mental faculty. Id. at 50. The victim in Sims suffered a broken nose and a bruised cheekbone as the result of being hit in the face with a gun by the defendant during a robbery. Id. at 48. After observing that the victim had been given anti-anxiety medication but that no pain medication had been prescribed, this court concluded that the "pain commonly associated with a broken nose" was not "extreme enough to be in the same class as an injury" involving the other elements of the serious bodily injury definition. Id. at 49. Because the proof did not show the type of extreme physical pain required for serious bodily injury, the defendant's conviction was modified from especially aggravated robbery to aggravated robbery. Id. at 50.

In light of Sims, we question whether the evidence of extreme physical pain was sufficient to establish serious bodily injury. However, the evidence justifies a finding that the victim's wounds involved a substantial risk of death. Taken in the light most favorable to the state, the proof showed that the victim received two gunshot wounds, one of which was to his left chest and caused him to spit up blood. He was taken by ambulance to the hospital's shock trauma unit, where the trauma team controlled the bleeding, took X-rays, ran tests, and probed his wound for tracking. After seventeen minutes in the trauma unit, the victim was transferred to the critical care unit of the hospital, where he was admitted for twenty-three hours of observation. That the victim's vital signs

were stable at the time of his transfer to the critical care unit of the hospital does not mean that his condition was not serious or life-threatening.

Thus, viewing the evidence in the light most favorable to the state, the defendants forced their way at gunpoint into the victim's car. Sutton took the victim's money, Johnson struck the victim three times on the back of his head, and the victim suffered serious bodily injury from gunshots fired by the defendants. The victim identified both defendants in the courtroom and testified as to the role of each in the robbery. Treasy Alsobrook testified that she planned the robbery with the defendants and was present when the robbery occurred. She stated that the defendants robbed, beat, and shot the victim. Phillip Collins, Johnson's former cell mate, testified that Johnson told him of hitting, robbing, and shooting the victim. Sergeant Reginald Morgan testified that Sutton gave a statement, in which he confessed to robbing the victim. From this evidence, a rational jury could have determined beyond a reasonable doubt that the defendants were the perpetrators of the offense. Therefore, the evidence is sufficient to support the defendants' convictions.

## II. SEVERANCE

Johnson contends that the trial court erred in denying his motion for severance. He asserts that he was prejudiced by the introduction of Sutton's statement of admission and by Sutton's disrespectful demeanor during trial. The state responds that Johnson has failed to show that the trial court abused its discretion in denying his motion for severance because he cannot demonstrate clear proof that he was prejudiced by the joint trial.

Rule 14(c)(2) of the Tennessee Rules of Criminal Procedure provides that a defendant is entitled to a severance of trial if it is "appropriate or necessary to promote or achieve a fair determination of that defendant's guilt or lack thereof." State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982)). Whether or not to grant a severance, however, lies within the sound discretion of the trial court. Id. (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)). We review this issue, therefore, for an abuse of discretion.

The record reflects that on October 25, 1999, before trial, Johnson filed a motion for severance in which he argued that Sutton's statement of admission was incapable of being sufficiently redacted to eliminate all references to him. We note, though, that the record does not contain a ruling from the court on this motion. The appellant bears the burden of providing a complete record. See State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). In effect, the defendant seeks to have us hold the trial court in error when the record does not show how the trial court ruled, if at all, and why. In any event, we do not believe that a joint trial was improper.

Johnson does not argue that Sutton's redacted statement contained any reference to him. Instead, he contends that the mere fact that Sutton's statement was introduced at the joint trial could have caused the jury to infer that he was involved in the crime because he and Sutton were on trial together. However, the mere fact that damaging proof is presented at trial against one defendant,

does not, by itself, entitle a codefendant to a severance. Meeks, 867 S.W.2d at 369. Instead, the proof must show that the defendant "was clearly prejudiced by the evidence regarding the codefendant to the point that it became a judicial duty to grant a severance." Id. (citing State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)). In this case, the trial court did everything it could to insure that Johnson would not be prejudiced by the admission of Sutton's statement. The trial court, the State, and defense counsel labored over Sutton's statement, ultimately producing a version in which all references to Johnson, either direct or implied, had been omitted. Before the witness read the redacted statement, the trial court instructed the jury that it was about to hear a statement purportedly made by Sutton, that the statement was being admitted only as it applied to Sutton, and that the jury was not to consider it as evidence against Johnson. Our review reveals no impropriety existing because of a joint trial.

Johnson's counsel also raised an objection to Sutton's demeanor and behavior during jury selection. The following exchange between defense counsel and the trial court occurred outside the jury panel's presence:

> MR. MANIS: Your Honor, I have some concerns regarding–I don't even know if this is appropriate, I guess I'll just say, the demeanor of the codefendant as regards to how it effects [sic] our case. His appearance. And he had his shirt basically up to here at one point in time when I turned around.
>
> He is, you know, I am just concerned and I think I need to make a record for a protection of my client in the future of the continuing joint proceedings of this magnitude. I mean, he clearly is showing disdain. He clearly is unhappy with what is going on around here. And, quite frankly, he looks guilty by the way he acts.
>
> . . . .
>
> THE COURT: Well, I haven't notice[d] but I haven't been looking, Mr. Manis. But I don't know necessarily that I agree with you. And I think the jury will be instructed that there are two trials, and they are to consider the evidence as to both individuals and as it applies to each individually.
> . . . .
>
> So I don't–I will be more alert to apparently Mr. Sutton's actions. But I am not–now if you are asking me to sever the case based upon his actions, I am not inclined to do that at this point. Obviously, it is something I can keep in mind. And if an appropriate time I think it is necessary, I will. But at this point, I am not going to.

-8-

MR. MANIS:  Just if the record could reflect my client's objection to that.

THE COURT:  All right.

MR. MANIS:  Thank you.

Although Johnson asserts that Sutton acted inappropriately throughout the trial, nothing in the record reflects that Sutton continued his misconduct or that Johnson's trial counsel renewed his objection.  The only reference to Sutton's demeanor in the record is the brief exchange quoted above, in which the trial court appropriately noted the concerns of Johnson's counsel and expressed its intention to be more alert to Sutton's behavior.  Without any additional evidence, Johnson cannot show that he was prejudiced by Sutton's behavior during trial.

## III.  SENTENCING

Finally, Johnson argues that his sentence was excessive.  The trial court sentenced Johnson as a Range I, violent offender convicted of a Class A felony, to twenty-five years in the Department of Correction, the maximum sentence allowed.  The court applied the following enhancement factors:

(1)  The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

. . . .

(11)  The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury; and

. . . .

(20)  The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

Tenn. Code Ann. § 40-35-114(1), (11), (20) (1997).  The court found no relevant mitigating factors. Johnson contends it was double counting for the trial court to apply both factors (1) and (20) to enhance his sentence.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d), -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper.  This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due

-9-

consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigation and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 239-40 (Tenn. 1986).

The sentence to be imposed by the trial court for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act, and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

In this case, because our review has revealed that the trial court misapplied enhancement factor (11), we conclude that the presumption of correctness regarding the trial court's sentencing determinations must fall. Accordingly, our review is de novo.

Johnson contends that factors (1) and (20) both deal with his prior criminal behavior, and thus, it was double counting for the trial court to apply both factors to enhance his sentence. The state responds by arguing that both factors were applicable because factor (1) was based upon Johnson's history of adult criminal behavior, while factor (20) was based upon his record as a juvenile.

-10-

In addition to a lengthy juvenile record, dating from the age of nine, Johnson's presentence report reveals a number of convictions that occurred from age eighteen to twenty-three, including criminal trespassing, disorderly conduct, and five convictions for driving on a suspended license. At sentencing, the trial court indicated that it was basing the application of factor (1) on both Johnson's criminal behavior as an adult and as a juvenile. To the extent that it based the application of enhancement factor (1) on Johnson's juvenile record, the trial court erred. See State v. Bruce Monroe Stevenson, No. E2000-00805-CCA-R3-CD, Bradley County, slip op. at 3 (Tenn. Crim. App. Jan. 12, 2001), app. filed (Tenn. Jan. 19, 2001); see also State v. Bobby Earl Perkins, No. W1999-01368-CCA-R3-CD, Haywood County, slip op. at 5-6 (Tenn. Crim. App. July 28, 2000), app. denied (Tenn. Mar. 12, 2001) (stating that by adding factor (20) to list of enhancement factors, the legislature made clear that it "did not contemplate delinquent acts to be 'criminal convictions or criminal behavior' as provided in enhancement factor (1)"). Nevertheless, it was appropriate to apply enhancement factor (1) to enhance Johnson's sentence, based on his substantial record of adult criminal behavior.

Enhancement factor (20) was also appropriately applied in this case. Johnson's presentence report reveals that he was convicted of several offenses as a juvenile that would have constituted felonies if committed by an adult. Among these is a 1989 conviction for involuntary manslaughter, which he received at the age of fourteen.

The trial court also applied enhancement factor (11), the "felony resulted in death or bodily injury . . . and the defendant has previously been convicted of a felony that resulted in death or bodily injury," based on Johnson's juvenile conviction for involuntary manslaughter. Although Johnson does not contest the application of this factor, the state correctly observes that the trial court should not have applied the factor based on Johnson's conviction as a juvenile. We note, however, that although the trial court erroneously applied enhancement factor (11), it indicated that it was placing "much more emphasis" on Johnson's lengthy criminal record and history of criminal behavior.

In sum, the trial court correctly applied two of three enhancement factors in this case. There were no relevant mitigating factors. In our view, the presence of enhancement factors (1) and (20), combined with the lack of any relevant mitigating factors, justifies the imposition of the maximum sentence of twenty-five years.

In consideration of the foregoing and the record as a whole, we affirm the judgments of conviction as to both defendants.

_____
JOSEPH M. TIPTON, JUDGE