# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 18, 2006 Session

## STATE OF TENNESSEE v. ALBERT R. NEESE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-C-2017     Monte Watkins, Judge**

---

**No. M2005-00752-CCA-R3-CD - Filed December 15, 2006**

---

The defendant, Albert R. Neese, appeals from jury convictions of two counts of aggravated sexual battery and two counts of rape of a child. The defendant also appeals the imposition of consecutive sentences which totaled twenty-eight years. The issues on appeal include challenges to the admissibility of a videotaped interview of the seven-year-old victim, the defendant's pastor's report to the police, and the victim's statement to a social worker for medical diagnosis and treatment. The remaining issues are the propriety of the jury instructions as to the mens rea elements of child rape and the propriety of consecutive sentences. Having found no reversible error, we affirm the judgments of conviction and sentence as imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., joined. DAVID H. WELLES, J., filed a separate opinion.

David L. Raybin and William Bruce, Nashville, Tennessee, for the appellant, Albert Ray Neese.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Bernard McEvoy and Jennifer Tackett, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant, at trial, faced indictment on charges of aggravated sexual battery (Class B felony) in counts one, three, and five, and rape of a child (Class A felony) in counts two and four. A jury convicted the defendant on all counts as charged. At sentencing, the trial court dismissed the aggravated sexual battery in count three and imposed an effective twenty-eight-year sentence on the remaining counts. Eight concurrent years on each conviction of aggravated sexual battery and twenty concurrent years on each rape of a child conviction, with the two groups to run consecutive, constituted the total sentence imposed.

The defendant appeals his convictions and sentence, raising the following issues:

1. Whether the admission of an ex-parte video recording of the victim was in error:
   a. As violating the defendant's right to confrontation under the Tennessee and the United States Constitutions,
   b. As failing to qualify as an exception to the general prohibition of hearsay testimony,
   c. As violating the defendant's right to a fair trial under the due process provisions of the United States Constitution;
2. Whether the defendant's pastor's "report to the police" constituted inadmissible hearsay;
3. Whether a licensed clinical social worker's testimony of the victim's hearsay statements was admissible;
4. Whether the trial court erred in its instructions as to the mens rea elements of child rape; and
5. Whether the trial court properly imposed consecutive sentences under Tennessee Code Annotated section 40-35-115(b)5 and the United States Constitution.

This case concerns charges against the defendant for sexual abuse of his step-granddaughter, C.C.[1] On June 14, 2003, the victim's mother, Malina Shannon, had returned to the defendant's house unexpectedly early from an errand. At the time, the defendant was the only adult present and was babysitting for Mrs. Shannon's four children. The children then ranged in age from six months to seven years, which was the age of the victim. Mrs. Shannon's husband, Wilson Shannon, was the only child of the defendant's wife, Athena. The Shannons, at that time, lived in New Johnsonville but frequently visited in the defendant's home in Nashville on weekends. On this occasion, Mrs. Shannon's vehicle had broken down two blocks away, and she returned to the house by using a child's scooter. She stated that the children inside the house were crying. Mrs. Shannon saw C.C. sitting on a scrap of carpet in the carport with her panties down to her ankles. A male dog, Boo, was in close proximity with its genitals showing signs of arousal. The defendant was standing nearby and in the act of fastening his shorts. Mrs. Shannon first went to the victim to care for her. The defendant immediately went inside the house without comment. Mrs. Shannon went inside also to call the defendant's wife and tell her to return home. Mr. Shannon happened to call then and was told to come there by his wife. Mrs. Shannon went back outside and found the victim with her panties down again and the dog, Boo, licking her pubic area. Mrs. Shannon explained to the victim that this behavior was inappropriate. She also questioned the victim as to what the defendant had done.

When the defendant's wife and Mr. Shannon returned, Mrs. Shannon related what she had seen. The Shannons and their children then left the defendant's residence. On June 16, the following Monday, Mrs. Shannon reported the incident to Nashville Metro Police. She spoke with Detective Grant Carroll, who scheduled an interview of the victim at Nashville Child Advocacy.

---

[1] Our court's policy is to refrain from publishing the names of minor victims of sexual abuse.

Detective Carroll asked Mrs. Shannon to wear a wireless transmitter and to confront the defendant. She did this on June 23. The taped conversation was played for the jury.

Mrs. Shannon described the defendant's backyard as containing an above ground swimming pool and a sauna referred to as the smokehouse.

On cross-examination, she admitted that she had instituted a civil suit against the defendant, seeking two million dollars in damages. Mrs. Shannon also stated that she had not seen the defendant do anything inappropriate to the victim.

James Rockey, in June 2003, was the pastor at the church attended by the defendant and his wife. On June 15, Pastor Rockey was consulted by the defendant and his wife. The defendant exhibited tears and appeared distraught to Pastor Rockey. In their meeting after the church service, the defendant told Pastor Rockey that he had sinned against God, his church, his wife, and his family. The defendant related that on that weekend he had seen their dog licking the victim's privates and that he too licked her. The defendant also stated that in 2002, possibly in November, he had touched the victim. The pastor did not inquire further. Later, Pastor Rockey reported the incident to the Department of Children's Services.

The victim was eight years old at the time of the defendant's trial. C.C. testified how she had allowed Boo, the dog, to lick her vagina, which she referred to as "her private." The defendant had witnessed an incident of this type previously and told her he would keep it a secret. She stated that, on another occasion, the defendant had allowed the dog to lick the defendant's penis. The victim described another incident when she and the defendant were in the smokehouse, and the defendant touched her vagina. She used dolls to demonstrate the touching and said it happened more than once. The victim related another incident wherein she and the defendant rubbed their exposed privates together. The victim further testified that on another occasion she had touched the defendant's exposed "private" while they were in the smokehouse. The victim stated that she had suggested they touch privates, and the defendant agreed. The victim said she liked doing "bad touches" with "Paw Paw" (the defendant) but did not like to get caught. She said she locked the smokehouse door to avoid being caught. The victim next related that on one occasion she reclined on the bench in the smokehouse while the defendant licked her private while supporting himself on his hands and knees. On another occasion, the victim stated that she licked the defendant's private while standing on a bench in the smokehouse. The victim recalled another incident when she was sitting with the defendant in the swing in the back yard. She stated that there was a blanket over them and that the defendant felt her private under the blanket but on top of her clothing. The victim next described the events on the day that her mother discovered the victim with the dog and the defendant. She said the defendant was in the swing, watching her and "sort of guarding [her]." The victim said that the defendant had bent down and touched her private from his seated position in the swing.

In cross-examination, the victim was asked about the number of times she had talked to the individuals interviewing her and the two prosecuting attorneys. Other questions were related to the events she had described during direct examination.

Hollye Gallion was a pediatric nurse practitioner at Our Kids Center who had examined the victim for evidence of sexual abuse. Ms. Gallion was recognized by the trial court as an expert in the field of diagnosis and treatment of child sexual abuse. Ms. Gallion testified that Phyllis Thompson, a social worker, had done the initial interview with the family and victim in order to obtain the history of the complaint. Ms. Gallion performed the genital exam based on the allegations contained in the history. The examination, performed with a culpascope, proved to be normal. She stated that less than seven percent of examinations produce physical evidence of sexual abuse. Ms. Gallion stated that her results neither confirmed nor denied actual sexual abuse.

Phyllis Thompson served as a licensed clinical social worker at Our Kids Center. She had taken the victim's history as related by the victim and her family. This information was then given to the pediatrician or licensed nurse practitioner who performed the physical examinations. Ms. Thompson related the incidents told to her by the victim. These included the defendant touching the victim's privates by hand, the last time being the previous Saturday, June 14. The defendant's tongue touched the victim's private more than once. The defendant's private had touched the victim's. The victim had touched the defendant's penis both by hand and mouth. Ms. Thompson admitted that, in gathering a history, the model used in questioning children included the use of leading questions at times.

Grant Carroll was, in June 2003, a detective with the Youth Services Division of Metro Nashville Police. After receiving Mrs. Shannon's report alleging sexual abuse of her daughter, Detective Carroll scheduled an interview of the victim by Ms. Pam Scretchens of Nashville Child Advocacy Center. He explained that the police used this agency for interviewing children due to the expertise required. Over the defendant's objection, the video-recorded interview of the victim was played for the jury. Detective Carroll had equipped Mrs. Shannon with a wire transmitter for her meeting with the defendant on June 23. Detective Carroll interviewed the defendant personally on June 25 and audio-recorded the conversation. During the interview the defendant admitted to licking the victim on her "butt cheeks" on June 14. The defendant said he had seen the dog lick the victim on several occasions. He stated that he had once rubbed the victim against him in response to one of the victim's questions. The defendant related how the victim had once jumped in his lap and kissed him and he had corrected her. The defendant also told of a game he and the victim played simulating the victim having "kittens" as he pushed on her abdomen. The defendant denied allegations of abuse or of sexual gratification motives.

After reading an election of offenses, the State rested.

The defense's only witness was the defendant. He recounted the events of June 14, saying that he went outside and saw the dog licking the victim. The victim asked the defendant to play. The defendant stated that he was concerned with getting back to the younger children in the house.

The defendant said that in a lapse of judgment, he had kissed the victim's "butt." When Mrs. Shannon returned, he was merely buttoning a top button on his shorts that habitually became unbuttoned. He stated that this was the account he conveyed to his pastor. He denied any other form of inappropriate behavior on his part and said he never was undressed outside the house. The defendant said that Wilson and Malina Shannon had filed a civil suit against him for two million dollars. He also stated that Mrs. Shannon had sent an email message of the allegations to his church.

Analysis

Admission of Video Recording

The video recording in question was of an interview of the victim by Ms. Pam Scretchens, an employee of Nashville Child Advocacy Center. According to Detective Grant Carroll, the Nashville Metro Police Department relied on this agency for their forensic interviews of children. The interview took place in a comfortable setting, and a large blank paper on an easel was present. The interviewer used this aid in having the victim relate her account of past incidents of abuse. The interview was approximately one hour in duration. The victim essentially repeated the allegations contained in her trial testimony with some additional elaborations. The video was admitted by the trial court on the grounds that the defendant had attacked the victim's credibility. The video was admitted as a prior consistent statement to rehabilitate the victim's credibility. The jury was instructed that the evidence was only for assessing the victim's credibility and was not substantive evidence. The video was shown to the jury during the testimony of Detective Carroll. The jury requested to see the video again during its deliberations, and the trial court complied, again giving the same accompanying instruction.

The defendant first asserts that the evidence violated his right of confrontation pursuant to Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004). The Supreme Court held that testimonial statements are admissible only when the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine. Id., 541 U.S. at 59. Testimonial evidence was not fully defined, but the court observed that an accuser's formal statement to a government officer was testimonial. Id. at 51. Under the facts of this case wherein the questioning of the victim was performed by a surrogate of the police, the statement would be testimonial. However, we conclude that the defendant is not entitled to relief. The defendant had, prior to the introduction of the video, cross-examined the victim and could have recalled the victim for examination as to the content of the recording. The facts herein do not present an occasion of unavailability which would call for the confrontation protections protected by Crawford.

The defendant contends that State v. Pilkey, 776 S.W.2d 943 (Tenn. 1989), and State v. Deuter, 839 S.W.2d 391 (Tenn. 1992), support his contention that the ex-parte video violated the right of confrontation. We believe that Pilkey and Deuter are distinguishable from the instant case in that in both cases the objectionable testimony was introduced as substantive evidence as opposed to the present case. No instruction concerning the use of the evidence was provided in Pilkey or Deuter unlike the procedure followed in the present case.

The defendant next asserts that the video interview constituted "bolstering" of the victim's testimony in the absence of any attack on the victim's credibility. The State responds by arguing that the victim's credibility was attacked and that the video was introduced not as substantive evidence but to show a prior consistent statement in support of the victim's testimony.

The defense adopted by the defendant was that the young victim, in her desire to please adults, had been programmed to recite a litany of allegations against the defendant. This theory was broached initially by questions during jury voir dire. The prospective jury members were questioned by the defendant's counsel as to whether they believed a child would make excuses if caught by her mother doing something wrong. Other representative questions were: "Do you think children are impressionable? Do you think they will say things, what people want them to say?"' "There is a fine line between preparation and programming. Would you agree?" and "Do you think it is possible that a child could be encouraged to say something that isn't true to please somebody?" In questioning an individual juror who had been a teacher, counsel asked the juror if he ever had children who "made things up to please their parents."

In opening statements, the defendant's counsel told the jury that they must decide if the victim was telling the truth or making something up due to being caught interacting with the dog. Also, in opening statements, counsel told the jury they must decide if the victim had been programmed through the interviews and the prosecutors' preparing her for trial.

The defendant's counsel pursued this theme during cross-examination of the State's witnesses. During the cross-examination of the victim's mother, she was asked the frequency of the victim's visits to Our Kids Center, Nashville Child Advocacy Center, and the Rape and Sexual Abuse Center. The victim's mother was also questioned about her civil suit seeking two million dollars in damages from the defendant for his abuse of the victim.

Phyllis Thompson, the clinical social worker at Our Kids Center, was thoroughly cross-examined by the defendant's counsel as to her protocol in interviewing, including the use of leading questions to focus the victim.

The forensic interview videotape was admitted by the trial court during the testimony of Detective Carroll. The trial court relied on his finding that "to some degree, [the victim] was impeached." The jury was instructed at the time of the video admission as follows: ". . . this is not substantive evidence. That is, it is not evidence proving facts in this case. It is played for the purpose of assessing her credibility only."

The defendant's counsel, in closing argument, referred to the forensic interview as a "staged production." Counsel also stated that the victim "gets confused when she gets away from the script." More references to programming of the victim were also made by the defendant's counsel.

The credibility of the victim in this case was crucial to the State due to the paucity of other incriminating evidence. It was equally important to the defendant that doubt be cast on the victim's

testimony. The defendant attempted to do this by suggesting that investigators and counselors had programmed the child through repetitive sessions.

Prior consistent statements are permissible after an impeaching attack on the witness's testimony. State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App.1993); State v. Robert D. Walsh, No. W1999-01473-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 69, *4 (Tenn. Crim. App. at Jackson, Jan. 30, 2001), perm. app. den. (June 4, 2001). "[I]t is well-established in this state that a prior consistent statement is admissible to rehabilitate a witness after insinuations of recent fabrication or deliberate falsehood or to respond to impeachment by a prior inconsistent statement." State v. Daniel D. Naughton, Sr., No. 02C01-9612-CR-00449, 1998 Tenn. Crim. App. LEXIS 317, *12 (Tenn. Crim. App. at Jackson, Mar. 18, 1998). The impeaching attack on the witness's credibility need not be successful for admissibility of the prior consistent statement. Id. at *13.

On the two occasions that the jury viewed the video interview, the trial court, before and after each viewing, instructed the jury that it was not substantive evidence and was for use only in assessing the victim's credibility. This is a proper instruction to ensure against the use of the evidence for other than corroborative purposes. See State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995). A prior consistent statement used to rehabilitate a witness is not hearsay as it is not offered for the truth of the matter asserted. Tenn. R. Evid. 801(c).

We conclude that the admission of the forensic interview video was not error. In light of the defendant's assertions of programming the victim by repetitive means, the interview corroborated the victim's testimony at trial. It was effective rebuttal in that the interview occurred during the initial investigation of the complaint before counseling sessions were instituted and prior to the repeated visits to counselors.

In summary, we conclude that the forensic interview was not hearsay in that it was not offered for the truth of the statements therein. The interview was introduced as corroboration of the victim's in-court testimony after impeachment by the defense. A proper instruction was provided the jury for the purpose for which the evidence could be considered. The defendant has not demonstrated error on this issue.

Pastor Rockey's Police Report

The next issue concerns a report prepared by the Department of Children's Services as a result of Pastor Rockey's telephone report of the defendant's admissions. The State agrees with the defendant that the report was inadmissible hearsay but maintains that the error was harmless.

No witness testified who could authenticate the document, and Pastor Rockey did not have personal knowledge that the report was generated from his telephone call. See Tenn. R. Evid. 901(a),(b)(1). There was no evidence that the report was self-authenticating pursuant to Tennessee Rules of Evidence 902(1). Due to the lack of proper authentication, the document was erroneously admitted as evidence.

In addition, the report constituted hearsay under Tennessee Rule of Evidence 801(c). The trial court observed that "it looks like a business record," but no witness or custodian testified to its preparation and no certification pursuant to Tennessee Rule of Evidence 902(11) accompanied the document. The document did not qualify as an exception to hearsay under Tennessee Rule of Evidence 803.

Nevertheless, we agree with the State that the error was harmless beyond a reasonable doubt. See Tenn. R. Crim. P. 52(a). Pastor Rockey testified in detail as to the defendant's revelations to him. He further clarified or explained the inconsistences contained in the report's wording. Pastor Rockey testified that he did not recall using the words "vagina" or "fondled" as contained in the report in making his oral report. His testimony of the defendant's admissions and the erroneously admitted report were otherwise consistent. In light of the pastor's testimony, the erroneous admission was harmless beyond a reasonable doubt.

Victim's Statements for Medical Diagnosis and Treatment

In this issue, the defendant contends that the trial court erred in allowing a licensed clinical social worker to testify concerning the victim's allegations under the medical diagnosis exception to the hearsay rule. Tenn. R. Evid. 803(4).

Phyllis Thompson was the social worker who interviewed the victim at Our Kids Center. One purpose for obtaining the victim's relevant history was for the use of medical personnel in their subsequent medical examination and treatment. Hollye Gallion, the nurse practitioner and examiner in this case, confirmed that this was the procedure followed at Our Kids Center. The defendant maintains that, due to Ms. Thompson being "only" a licensed clinical social worker, the statement would not qualify under the medical diagnosis hearsay exception. The rule excepting such statements from the hearsay prohibition is as follows: "Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Tenn. R. Evid. 803(4). The plain wording of the exception does not require that the statement be imparted to medical personnel, but it does require that the information is intended for use in diagnosis and treatment. The scope of the rule applies to any person to whom a statement is made for purposes of or is pertinent to medical diagnosis and treatment. State v. McLeod, 937 S.W.2d 867, 869 fn.1 (Tenn. 1996); cf. State v. Barone, 852 S.W.2d 216 (Tenn. 1993) (wherein the rule was not extended to statements made to psychologists).

There was evidence in the instant case that the method utilized was standard procedure at Our Kids Center. The clinical social worker took the victim's history and relayed the information to medical personnel. The information was taken at least in part, for medical diagnosis and treatment. We conclude that the statement was admissible hearsay pursuant to Tennessee Rule of Evidence 803(4).

Mens Rea Jury Instructions

The defendant next contends that the trial court erred by charging the jury that the defendant could be convicted of rape of a child if "the defendant acted either intentionally, knowingly or recklessly." The defendant argues that child rape is defined by conduct and that the inclusion of recklessness impermissibly lessened the State's burden of proof.

"[A] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Each element of an offense must be described and defined by the trial court. State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). A charge is prejudicial error if it fails to "submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

The precise issue which the defendant posits in this case was addressed in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 1053, **35-37 (Tenn. Crim. App. at Nashville, Nov. 30, 2004), perm. app. denied (Tenn. Mar. 21, 2005). This court therein stated that the elements of rape of a child are unlawful sexual penetration of the victim and the victim being less than thirteen. The unlawful sexual penetration of the victim was categorized as both nature of the conduct and result of the conduct. Id. at *16. Because the crime of child rape contains all three conduct elements, a jury can find the defendant guilty by determining the defendant acted intentionally, knowingly, or recklessly. Id. at *14.

We acknowledge that this position is not unanimously held by the members of our court. The opposing view is contained in State v. Weltha Womack, No. E2003-02332-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 2 (Tenn. Crim. App. at Knoxville, Jan. 4, 2005). Therein, a panel of this court held that sexual penetration as used in the offense of aggravated rape was a nature of conduct element. The Womack court determined that the inclusion of recklessness in the jury instruction was reversible error in permitting a conviction based on reckless penetration. However, a majority of this panel adheres to the holding in Walters, 2004 Tenn. Crim. App. LEXIS 1053, *16, that "unlawful sexual penetration of the victim is both nature of the conduct and result of the conduct [element]."

As a companion issue, the defendant asserts that the mens rea charge of intentionally, knowingly, or recklessly in the disjunctive permitted the possibility of a non-unanimous verdict on the child rape charges.

We agree with the defendant that the definition instruction was in the disjunctive and authorized a conviction based on a reckless mens rea element. However, we have previously determined that the elements of the crime of child rape can be proven by a mens rea of intentionally, knowingly, or recklessly. Therefore, a majority herein concludes that the inclusion of recklessness in the disjunctive does not pose a threat of a non-unanimous verdict.

Our review reveals that the trial court in the instant case properly described the elements of the crime of child rape and correctly provided the statutory definitions for the mens rea requirements. Accordingly, we conclude that the subject jury instructions were proper and that the defendant has failed to demonstrate error as to either of the issues attacking the jury instructions.

Consecutive Sentencing

In his last issue, the defendant contends that the trial court erred in imposing consecutive sentences. The defendant bases his contention on allegations that the trial court failed to state its reasons for imposing consecutive sentences in accordance with Tennessee Code Annotated section 40-35-115 and that consecutive sentences are prohibited by the Sixth Amendment to the Constitution of the United States.

This court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. T.C.A. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is de novo. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after giving due consideration and proper weight to the factors and principles set out under sentencing law, and the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

Tennessee Code Annotated section 40-35-115(a)(b)(5) provides as follows:
(a)     If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.
(b)     The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

The Sentencing Commission Comments to Tennessee Code Annotated section 40-35-115 acknowledge that the statute is essentially a codification of two Tennessee Supreme Court cases: Gray v. State, 538 S.W.2d 391 (Tenn. 1976), and State v. Taylor, 739 S.W.2d 227 (Tenn. 1987).

-10-

The Court in <u>Taylor</u> gave the following guidance to trial courts in considering consecutive sentences:

> Trial courts should weigh the aggravating circumstances arising from the relationship between defendant and the victim or victims, the age of the victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical and mental damage to the victim or victims and determine the appropriate use of consecutive sentencing accordingly, bearing in mind the general objectives set forth in <u>Gray</u>. Obviously, no rigid formula for application to such cases would be appropriate, but we caution that consecutive sentences should not routinely be imposed in sexual abuse cases, or in other cases, and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

<u>Taylor</u>, 739 S.W.2d at 230.

The categories of offenders eligible for consecutive sentencing are set forth in T.C.A. § 40-35-115. The pertinent provision for this defendant is as follows:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

<u>Id.</u> at 40-35-115(b)(5).

The evidence established that the defendant was considered by the victim as her grandfather, and she called him Paw-Paw. The defendant frequently was the caretaker for the victim and her siblings. The defendant had occupied a position of trust within the familial structure.

The evidence did not clearly delineate the time span over which the abuse occurred. We can infer that it occurred over several months from the different incidents described by the victim and the fact that her visits to the defendant's occurred on weekends. Pastor Rockey stated that the defendant admitted to touching the victim possibly in November of 2002, seven months prior to June 14, 2003. These factors indicate a relatively long period of undetected abuse by the defendant.

The nature and scope of the acts of abuse are documented earlier in this opinion and their specifics need not be repeated. Suffice it to say, those acts provide strong justification to protect the public from the defendant by consecutive sentencing.

Rebecca Lee, a therapist with the rape and sexual abuse center, had been counseling the victim since August 2003. She testified that the victim had suffered severe trauma, exacerbated by the defendant's betrayal of trust and the involvement of an animal. Ms. Lee stated that the severe trauma experienced by the victim produces definite changes in the brain, making emotional regulation problematic. This could result in the victim being more vulnerable to depression, phobias, eating disorders, chemical and behavioral addictions, and impulse control. Ms. Lee expressed hope

that the early treatment of the victim and her family's close support would help her avoid these dangers. She stated that the length of time, the relationship of the defendant, and the multiple acts involved, especially with an animal, all weighed against the victim's prospects. Tangible signs of adverse effects on the victim had been observed by Ms. Lee. The victim had involved other children in sexual play and had assumed the role of a dog in play sessions.

The victim's mother, Malina Shannon, also testified at the sentencing hearing as to the effects she had observed concerning the victim. Mrs. Shannon stated that the victim acted precocious, needed reassurance, expressed anxiety over losing family members, and was more aware of sexual behavior.

The evidence establishes that sufficient grounds exist to justify the imposition of consecutive sentencing. The defendant's willingness to breach his position of trust, the multitude of acts involved, and the defendant's callousness toward the harm suffered by the victim all support the proposition that society should be protected from the defendant. The individual sentences were all set at presumptive ranges. Consecutive sentencing was appropriate under the facts of this case.

The defendant asserts, without argument or citation to authority, that consecutive sentences are prohibited by the Sixth Amendment. We consider the issue waived by the defendant pursuant to Tennessee Court of Criminal Appeals Rule 10(b).

Conclusion

There being no reversible error revealed by our review, the judgments of conviction and sentencing are hereby affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE